1997-NMSC-060

950 P.2d 789

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Christopher MORA, Defendant–Appellant.**

No. 23693.

Supreme Court of New Mexico.

Nov. 17, 1997.

Freedman, Boyd, Daniels, Hollander, Guttman & Goldberg, P.A., Nancy Hollander, Albuquerque, for Defendant–Appellant.

Tom Udall, Attorney General, Elizabeth Blaisdell, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

## OPINION

SERNA, Justice.

{1} Defendant Christopher Mora was convicted of first-degree murder (felony murder, with criminal sexual contact as the underlying felony), criminal sexual contact in the third degree (child under thirteen) and intentional child abuse resulting in great bodily harm or death. The jury found Defendant not guilty of criminal sexual penetration and negligent child abuse. Defendant appeals his convictions and, alternatively, his sentencing for the convictions.

{2} Defendant raises the following issues on appeal: (1) that his felony murder conviction was unconstitutional because the State did not prove all essential elements of the crime; (2) that his convictions for intentional child abuse resulting in death and criminal sexual contact were unconstitutional because the convictions were not supported by sufficient evidence; (3) that the State's failure to disclose the existence of recorded interviews of two critical prosecution witnesses, until after the defense had cross-examined them, denied Defendant his right to prepare a defense, to confront and cross-examine witnesses and to a fair trial; (4) that the admission of the hearsay testimony of a deceased witness violated Defendant's right to confrontation because the testimony contained no particularized guarantees of trustworthiness, and the testimony was more prejudicial than probative; (5) that two autopsy photographs should not have been admitted because they were irrelevant and because their prejudicial effect substantially outweighed their probative value; (6) that the admission of his guilty plea to possession of stolen property was improper because its prejudicial effect substantially outweighed any probative value of the evidence; (7) that the prosecutor improperly used the prior guilty plea to argue Defendant's guilt in closing argument; (8) that his sentence violated his protection against double jeopardy; and (9) that the above constitute cumulative error that denied Defendant due process and a fair trial. We affirm the trial court on all issues except the sentencing of Defendant for both felony murder and intentional child abuse resulting in death; therefore, we need not address the issue of whether cumulative error deprived Defendant of a fair trial.

*FACTS*

{3} This case involves the tragic death of a twenty-three-month-old child, Christina Si-

erra. Christina was pronounced dead on November 25, 1994. Christina was killed by an intentional blow to her skull, and was apparently the victim of a sexual assault. A jury found Defendant Christopher Mora responsible for Christina's death, and convicted him based on the following facts presented at trial.

{4} Defendant and Andrea Garcia, the mother of Christina Sierra, began dating in September 1993. In September 1994, Defendant and Garcia moved into an apartment together. Christina lived with Defendant and Garcia. Garcia was attending school during the day and Garcia's mother, Virginia Saavedra, took care of Christina while Garcia attended school.

{5} Christina had been receiving medical treatment, and was admitted to the hospital, in the weeks prior to her death. Prior to the time Defendant moved in with Garcia, Christina had not had an extensive medical history. Christina died on November 25, 1994; however, the evidence showed, and Defendant does not dispute, that the fatal blow to Christina's skull occurred on November 24, 1994, Thanksgiving day.

{6} At trial, Defendant and Garcia provided *conflicting testimony regarding the* events which occurred on November 24. Garcia testified that on Thanksgiving morning, she and Defendant got out of bed at the same time, and she went to attend to Christina. Later, Christina, Garcia and Defendant were watching the Macy's Thanksgiving parade on television. Garcia decided to take a shower and she left Christina, who Garcia testified was awake and alert, in the care of Defendant. Garcia proceeded to take a lengthy shower of approximately twenty to twenty-five minutes. When Garcia emerged from the bathroom, according to Garcia's testimony, Garcia saw Defendant walking down the hall with Christina apparently asleep on his shoulder. Defendant told Garcia he was putting Christina to bed because she had fallen asleep. Garcia testified that she thought it was strange that Christina was asleep, because Christina did not usually take a nap so soon after she woke up in the morning.

{7} Defendant, on the other hand, testified at trial that Christina had awakened the morning of November 24, crying. According to Defendant, he and Garcia had been having sex early Thanksgiving morning when they were interrupted by the cries of Christina coming from her bedroom. Defendant testified that Garcia did not want to attend to the baby, but that Defendant insisted that she do so. Defendant testified that Garcia slammed the bedroom door as she went to Christina's bedroom to check on her. Defendant testified that when Garcia took Christina from her room into the living room, Christina was "crying real loud …not just a cry …screaming" and that "all of a sudden she just stopped crying." Defendant testified that when he emerged from the bedroom into the living room, about twenty minutes later, Christina appeared to be asleep in her stroller. Defendant testified that Garcia tried to feed Christina some cereal but Christina would not eat. Garcia then went to take a shower, leaving Christina in Defendant's care. While Garcia was in the shower, according to Defendant, Defendant went into another room to answer a phone call from Joseph Sena. Upon finishing the call, Defendant testified that he put the sleeping child back into her bed, while Garcia was coming out of the bathroom. Defendant testified that Garcia had a "scared look on her face" when he put Christina in her bed.

{8} Defendant's testimony at trial appeared to support the defense theory that Garcia may have caused Christina's injuries. The jury, however, heard testimony that Defendant made conflicting statements to the police and to Garcia's cousin Randy Chavez. According to the testimony of Albuquerque Police Detective Vicki Ortiz, in his prior statement to the police made eight days after Thanksgiving, Defendant said that when he got up that Thanksgiving morning, he prepared cereal for Christina, which Christina ate. Defendant also said in his statement "[a]nd then Christina was in her stroller and [Andrea] came and said uh, you wanna to take a shower, Christina, you know, she was talking to her, she couldn't talk back. And she said, no, like she didn't wanna stay in the stroller. She always wanted to stay in the stroller, I don't know." These statements

conflicted with Defendant's testimony at trial that Christina had been asleep all morning.

{9} The jury also heard the testimony of Randy Chavez who testified that Defendant had told him in the hospital waiting room that Christina had fallen asleep on the couch while Andrea was taking a shower, and that Defendant put Christina to bed. Later that day, Randy Chavez heard Defendant say that Christina was falling asleep, so he picked her up, and when Garcia finished her shower, Defendant and Garcia put Christina to bed together. These accounts also differed from Defendant's trial testimony that Christina had been asleep all morning.

{10} Both Defendant and Garcia testified that they soon realized Christina was unconscious and not breathing. Garcia called 911. The paramedics arrived and transported Christina to the University of New Mexico Hospital. William Chavez, a paramedic who arrived at the scene, questioned Garcia about older bruises on Christina, and he testified that Garcia responded to him that Christina had fallen off the bed a few days earlier. Garcia traveled in the ambulance with Christina, but Defendant stayed behind at the apartment. Defendant arrived at the hospital approximately an hour later. Police detectives investigated the apartment and gathered evidence some time after the Defendant left the apartment.

{11} Christina was treated by a variety of medical personnel at the hospital. Several members of the emergency room staff and the intensive care staff noted a scratch or tear near Christina's anus, or perineum. No member of the intensive care staff noted any vaginal bruising on Christina. Dr. Robert Katz, the director of the pediatric ICU, testified that he notified a specialist in sexual abuse, Dr. Renee Ornelas. At trial, Dr. Ornelas was recognized as an expert in pediatrics with a specialty in sexual abuse. Dr. Ornelas examined Christina before her death, and Dr. Ornelas testified at trial that the tear near Christina's anus was actually a "large, deep tear." Dr. Ornelas also testified at trial that she discovered perivaginal bruising and blood. In Dr. Ornelas' opinion, Christina had been anally raped within twenty-four hours of her examination.

{12} Christina was pronounced dead at 11:00 a.m. on November 25, 1994. A CAT scan, surgery, and finally the autopsy revealed recent, severe, soft-tissue injuries to the head, a skull fracture, and blood clots consistent with previous episodes of trauma. There was evidence that on November 14, 1994, doctors took full-body x-rays of Christina which showed that Christina had no skull fractures at that time. Dr. Blaine Hart, an expert in neuroradiology, testified at trial that he reviewed the x-rays of Christina's skull taken on November 14, 1994 and November 24, 1994. Dr. Hart testified that Christina's fracture was similar in degree of severity to those fractures he had seen in children ejected from a car in a high-speed freeway accident. Dr. Hart further testified that the head trauma which caused Christina's death most likely occurred within a day of the x-ray taken on November 24, 1994. The operating physician, Dr. Nevin Baldwin, estimated at trial that the "acute event" which caused Christina's head injury occurred within approximately two hours of when Dr. Baldwin began operating on Christina on Thanksgiving morning.

{13} At trial, Defendant called as an expert Dr. James Wilkie. The court recognized Dr. Wilkie as an expert in emergency room medicine. Dr. Wilkie examined Christina's medical records, including the x-rays and autopsy photographs taken after the fatal injury had occurred. Dr. Wilkie testified that, in his opinion, the cut near Christina's anus was approximately one week old. Dr. Wilkie's testimony contradicted Dr. Ornelas' testimony by stating that the autopsy contained no evidence of any vaginal bruising or bleeding. Further, Dr. Wilkie testified that the cuts and red marks described by Dr. Ornelas in her testimony could have been caused by various medical treatments, including suppository inserts, which Christina had received in the weeks prior to her death. In Dr. Wilkie's opinion, no evidence of sexual abuse existed.

{14} Dr. Ornelas' testimony relied on two autopsy photographs of Christina. Defendant objected to the use of these photographs on the grounds that the autopsy photographs would not show a person in the

same condition as when that person had been alive, and additionally, on the grounds that no foundation had been laid to establish who was depicted in the photographs. The court allowed the State to lay a foundation. Later, the defense objected to Dr. Ornelas' use of the photographs on the grounds that Dr. Ornelas had no personal knowledge that the photographs were of Christina, and that the photos were substantially more prejudicial than probative. The objections were overruled.

{15} Detective Vicki Ortiz and Detective Brian Sanchez were assigned to investigate Christina's death. Detective Ortiz interviewed Joseph Sena, the friend Defendant testified he had spoken with while Garcia was taking a shower that Thanksgiving morning. Detective Ortiz testified at trial that Joseph Sena had told her that he did not talk to Defendant on November 24. Joseph Sena died before Defendant's trial, and the trial court judge allowed Detective Ortiz to testify as to Sena's statement to her. Defendant objected to this testimony as inadmissible hearsay, irrelevant, and improper use of extrinsic evidence for purposes of collateral impeachment. The judge overruled Defendant's objections and allowed the jury to hear the statement.

{16} Detective Sanchez interviewed Virginia Saavedra, the victim's grandmother, on November 30, 1994, and he interviewed Henry Campos, Saavedra's ex-husband, on November 24, 1994. The State turned over these interviews to Defendant. However, interviews of Saavedra and Campos occurring on two other occasions were not turned over. During cross-examination of Campos on the second day of Defendant's trial, January 23, 1996, Campos mentioned he had answered questions on more than one occasion. Campos' testimony conflicted with the prosecution's assurance that all available evidence had been turned over to the defense. The defense moved for a mistrial, and the court denied the motion on the grounds that the court had no evidence before it that information had been withheld at that time.

{17} On January 25, 1996, four days into the trial, the prosecution informed the court that they had discovered the second taped interviews of both Saavedra and Campos. The prosecution claimed they had not remembered the second interviews because the tapes had not been tagged into evidence. The prosecution turned the tapes over to Defendant, and on the fifth day of trial, January 26, 1996, Defendant renewed his motion for mistrial, claiming that there were items in the taped interviews that would have affected the defense's cross-examination of witnesses. After reviewing the transcripts of the tapes, the trial court denied the motion for mistrial, finding that there was little difference between Campos' taped statement and his trial testimony. As to Saavedra's interview, the trial court stated that there were areas of inquiry that Defendant might want to pursue, based on the taped interview. The trial court ruled that it would allow Defendant to recall any witness as a result of Saavedra's taped interview; however, the defense chose not to recall any witnesses.

## ISSUE ONE—FELONY MURDER

{18} Defendant was charged with the crime of first-degree felony murder. NMSA 1978, Section 30–2–1(A)(2) (1994) sets forth the crime of felony murder as follows: "Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused ... in the commission of or attempt to commit a felony ...." In New Mexico, the State must prove the defendant intended to kill, or was knowingly heedless that death might result from defendant's conduct, in addition to proving that the killing occurred during the commission of a felony. *State v. Ortega,* 112 N.M. 554, 563, 817 P.2d 1196, 1215 (1991). Further, the New Mexico felony murder rule "only serves to raise second-degree murder to first-degree murder when the murder is committed in the course of a dangerous felony." *State v. Campos,* 1996 NMSC 043, ¶ 17, 122 N.M. 148, 921 P.2d 1266. The jury in this case needed to find that Defendant killed Christina in the commission of an inherently dangerous felony and that Defendant intended Christina's death, or knew that his actions would create a strong probability of death.

{19} The jury found Defendant guilty of the crime of felony murder, with the underly-

ing felony being criminal sexual contact of a minor. Defendant argues that the felony murder conviction should be reversed because (1) the underlying felony (criminal sexual contact) was not inherently dangerous so as to invoke the felony murder rule, (2) the evidence was insufficient to prove Defendant intended to kill Christina, and (3) the evidence was insufficient to prove that any murder was committed during the commission of any criminal sexual contact.

### 1) Inherent Danger of Underlying Felony of Criminal Sexual Contact

{20} Defendant argues that criminal sexual contact of a minor is not an inherently dangerous felony, and thus not a basis for a felony murder conviction. Defendant argues that while criminal sexual penetration of a minor may be inherently dangerous, mere contact is not. Defendant was acquitted of criminal sexual penetration of a minor and this, Defendant argues, supports a conclusion that the criminal sexual contact in this case was not inherently dangerous.

 {21} A presumption of inherent danger is appropriate in a felony murder case where the predicate felony is a first-degree felony, but not where the felony is of a lesser degree. *State v. Bankert*, 117 N.M. 614, 620, 875 P.2d 370, 376 (1994); *State v. Harrison*, 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977) *rev'd by rule on other grounds*, *Tafoya v. Baca*, 103 N.M. 56, 57, 60, 702 P.2d 1001, 1002, 1005 (1985). In this case, the Defendant was charged with both criminal sexual penetration of a minor, and criminal sexual contact of a minor. Criminal sexual penetration, as defined in NMSA 1978, Section 30–9–11(C) (1995), is a first-degree felony when it is perpetrated on a child under thirteen years of age. Criminal sexual contact of a minor, as defined in NMSA 1978, Section 30–9–13(A) (1991), is a third-degree felony when it is perpetrated on a child under thirteen years of age. In this case, a conviction of criminal sexual penetration, a first-degree felony, would have carried with it the presumption of inherent danger necessary to support a felony murder conviction. Defendant was not convicted of criminal sexual penetration, but was convicted of the third-

degree felony of criminal sexual contact of a minor. Thus, no presumption of inherent danger exists since criminal sexual contact of a minor is not a first-degree felony. However, a lesser degree felony may still support a felony murder conviction, depending on the circumstances surrounding the commission of the crime.

{22} This Court suggested in *Harrison* that it is for the jury to decide the inherent danger of an underlying crime in a felony murder case. 90 N.M. at 442, 564 P.2d at 1324. The *Harrison* court quoted R. Perkins, Criminal Law 34 (1957) as follows:

One who is perpetrating a felony which seems not of itself to involve any element of human risk, may resort to a dangerous method of committing it, or may make use of dangerous force to deter others from interfering. If the dangerous force thus used results in death, the crime is murder just as much as if the danger was inherent in the very nature of the felony itself.

90 N.M. at 442, 564 P.2d at 1324. The Court then stated, "In the final analysis this is for the jury to decide in each case, subject to review by the appellate courts." *Id.*

{23} In *Harrison*, this Court considered two approaches in determining whether a felony is inherently dangerous for felony murder purposes. *Id.* Under the first approach, "the felony is examined in the abstract to determine whether it is inherently dangerous to human life." *Id. See, e.g., People v. Lee*, 234 Cal.App.3d 1214, 286 Cal.Rptr. 117, 122 (1991); *State v. Wesson*, 247 Kan. 639, 802 P.2d 574, 579 (1990) *superseded by statute as stated in State v. Mitchell*, 262 Kan. 687, 942 P.2d 1, 5 (1997). This "abstract approach" analyzes the elements of the underlying felony without regard to the particular facts of the case. *Lee*, 286 Cal.Rptr. at 122. The abstract approach involves a two-step process by which the court first examines the "primary element" of the offense at issue to determine whether it involves the requisite danger to life. *Id.* The court then looks to the "factors elevating the offense to a felony" to determine whether the felony, taken in the abstract, is inherently dangerous to human life. *Id.* Thus, under the abstract approach, the court decides as a

matter of law whether a particular felony is inherently dangerous to human life.

■ {24} Under the second possible approach cited by *Harrison*, "both the nature of the felony and the circumstances surrounding its commission may be considered to determine whether it was inherently dangerous to human life." 90 N.M. at 442, 564 P.2d at 1324. Some courts have used this factual approach to determine inherent danger for purposes of felony murder. *See, e.g., State v. Noren*, 125 Wis.2d 204, 371 N.W.2d 381, 385 (Wis.App.1985); *State v. Stewart*, 663 A.2d 912, 919–920 (R.I.1995). When applying the factual approach, a court looks to the particular facts of the case to decide whether the defendant carried out the predicate felony in a manner dangerous to human life. Thus, a proscribed offense which on its face does not appear to be a dangerous felony, may be carried out in a manner which would allow it to serve as a predicate felony for felony murder. *Noren*, 371 N.W.2d at 385.

■ {25} In *Harrison*, this Court adopted the factual approach. 90 N.M. at 442, 564 P.2d at 1324. We see no reason to deviate from that ruling today. We cannot say as a matter of law whether a particular felony is or is not inherently dangerous to human life. This decision is necessarily fact-specific. We cannot say as a matter of law that criminal sexual contact of a minor is never an inherently dangerous felony. As stated in *Harrison*, it is for the jury to decide, subject to appellate review, whether a felony is inherently dangerous. *Id.* In this case, it was for the jury to decide whether the facts of the case warranted a conclusion that the criminal sexual contact of a minor was committed under inherently dangerous circumstances.

■ {26} Here, the trial court instructed the jury that it could find Defendant guilty of felony murder if it first found that Defendant "committed or attempted to commit the crime of Criminal Sexual Contact of a Minor (Child Under 13) *under circumstances or in a manner dangerous to human life . . .*" (emphasis added). We conclude that there was sufficient evidence to support the trial court's

decision to instruct the jury regarding the dangerousness of the circumstances surrounding the underlying felony of criminal sexual contact. *Cf. State v. Calvillo*, 110 N.M. 114, 120, 792 P.2d 1157, 1163 (Ct.App. 1990) (jury instruction not required where there is insufficient evidence to support it).

■ {27} It was proper for the jury to determine whether the crime of criminal sexual contact was inherently dangerous for purposes of felony murder. Therefore, on appeal we may overturn the jury's verdict only upon a showing of insufficient evidence. Under this standard, the Court views the evidence in the light most favorable to upholding the verdict, resolving all conflicts and indulging all permissible inferences in favor of the verdict. *State v. Hernandez*, 115 N.M. 6, 26, 846 P.2d.312, 332 (1993). The reviewing court does not weigh the evidence or substitute its judgment for that of the fact finder as long as there is sufficient evidence to support the verdict. *State v. Griffin*, 116 N.M. 689, 693, 866 P.2d 1156, 1160 (1993) (quoting *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988)). In a case involving circumstantial evidence, such as the case before us, reasonable doubt is not precluded unless circumstantial evidence viewed in the light most favorable to the State gives rise to an equally reasonable inference of innocence. *State v. Apodaca*, 118 N.M. 762, 766, 887 P.2d 756, 760 (1994).

■ {28} Based on the evidence presented at trial, a rational jury could have found that Defendant committed the crime of criminal sexual contact of a minor under circumstances dangerous to human life. First, the victim in this case was especially vulnerable—a 23 month old baby who had been very ill and who had been recently admitted to the hospital. Second, the jury reasonably could have inferred that Defendant committed the criminal sexual contact under a time pressure, while the baby's mother was in the shower. This time pressure, the jury reasonably could have inferred, resulted in Defendant committing sexual contact under hurried circumstances, causing Defendant to act in a manner dangerous to human life.

{29} The jury in this case decided that Defendant committed an inherently dangerous crime justifying a felony murder conviction. The determination of the inherent dangerousness of this crime was properly before the jury. The jury determined that Defendant committed the crime of criminal sexual contact under circumstances or in a manner dangerous to human life, and a felony murder conviction therefore was proper. The record contains substantial evidence to support the jury's verdict and we will not upset the jury's finding of felony murder based on criminal sexual contact.

## 2) Sufficiency of Evidence to Prove Intent to Kill

{30} In order to convict for felony murder in this case, the jury was instructed that it first must find that Defendant committed the underlying felony of criminal sexual contact (or alternatively, criminal sexual penetration), and that, additionally it must find that Defendant intended to kill the child, or knew that his actions created a strong probability of death or great bodily harm. The jury found each of these requisite elements to convict for felony murder, including intent, and we will not disturb the jury's finding unless there is insufficient evidence.

{31} In New Mexico, there is a mens rea requirement for felony murder. *See Ortega*, 112 N.M. at 563, 817 P.2d at 1205; *Griffin*, 116 N.M. at 695, 866 P.2d at 1162; *Campos*, 1996 NMSC 043, ¶ 16, 122 N.M. 148, 921 P.2d 1266. The felony murder intent requirement is satisfied if proof exists that the defendant intended to kill, knew that his actions created a strong probability of death or great bodily harm, or acted in a manner greatly dangerous to the lives of others. *Griffin*, 116 N.M. at 695, 866 P.2d at 1162.

{32} Defendant argues that insufficient evidence exists to support a finding that Defendant intended to kill Christina. However, reviewing the evidence in the light most favorable to the State, a rational jury could have found beyond a reasonable doubt that Defendant intended to kill Christina, or at least that Defendant knew his acts created a strong probability of death or great bodily harm to her.

{33} The State presented numerous experts who testified that Christina died as a result of a skull fracture which caused massive bleeding in the brain. Dr. Blaine Hart, the neuroradiology expert, testified that Christina's skull fracture was the result of severe force, inconsistent with a simple fall. In Dr. Hart's opinion, the fracture was caused either by striking the skull against a hard object, or by shaking the child and hitting the skull against a hard object. The State also presented the testimony of Dr. Nevin Baldwin, the neurosurgeon who operated on Christina, who stated that a skull would have to suffer an extreme impact to fracture in the way that Christina's skull was fractured. Even the Defendant's own expert, Dr. Wilkie, testified that, in his opinion, Christina was either struck against the wall or some other surface that was very hard. He agreed that the injury which killed the young child was intentionally inflicted.

{34} A rational jury could infer, based on this medical evidence, that Christina's head injuries were intentionally inflicted. Given Dr. Hart's opinion that the injury which caused Christina's skull fracture occurred within twenty-four hours of the x-ray taken on Thanksgiving morning, and given Dr. Baldwin's opinion that the injury occurred approximately two hours before he operated on Christina on Thanksgiving morning, a rational jury could infer that Christina's injuries occurred that morning. And further, a rational jury could infer, from the evidence produced at trial, that the Defendant was the person who intentionally inflicted these injuries.

{35} The jury heard the testimony of Detective Ortiz and Randy Chavez who both testified that the Defendant had told them Christina was awake Thanksgiving morning. This testimony contradicted Defendant's testimony on the stand that Christina had been asleep and unresponsive all morning. These inconsistent statements, plus the fact that Defendant was alone with Christina for approximately twenty-five minutes on Thanksgiving morning while Garcia was taking a shower, support the jury's verdict that it was Defendant rather than Garcia who intentionally inflicted the injury on Christina.

### 3) Sufficiency of Evidence to Prove the Murder Was Committed During the Commission of a Felony

{36} Defendant argues that there was insufficient evidence to prove that the murder was committed during the commission of the underlying felony on which the jury verdict was based, which was criminal sexual contact. To support this argument, the Defendant points only to the conflicting testimony of Dr. Wilkie and Dr. Ornelas. Defendant points to Dr. Wilkie's testimony that, in his opinion, the cut near Christina's anus was approximately one week old. Dr. Ornelas testified that it was her opinion that the tear occurred less than 24 hours before her examination of Christina. Dr. Ornelas testified that she examined Christina on November 25. The Defendant argues that Dr. Ornelas' testimony was inconsistent with the theory that the head injury and the perineum injury were inflicted around the same time. According to Defendant, if Dr. Ornelas' testimony were true, it would mean that Christina's injury to the perineum occurred while she was in the hospital being treated for her skull fracture on November 24.

{37} The State notes that Dr. Ornelas testified that the injuries occurred within twenty-four hours of her examination of Christina on Thanksgiving day, on November 25. Thanksgiving day was actually November 24. The State argues that the jury reasonably could have found that Dr. Ornelas actually examined Christina on Thanksgiving day, or that if she did examine Christina on the following day, it would have taken place early enough in the day to have put the time of the injury to the perineum within the same time frame as the head injuries.

{38} Moreover, the State cites to testimony at trial that no evidence of the trauma was noted the day before Thanksgiving, November 23. Saavedra testified that on November 23, she changed Christina's diaper and did not note anything unusual. Christina, who had been admitted to the hospital in mid-November because of dehydration, was taken to the hospital on November 23 because her leg was swelling. Tillie Atencio, a nurse who had been treating Christina on November 23, testified that she did not notice anything on the outside of Christina's genital area or her perineal area. The nurse had placed a soft bag with adhesive on the top over Christina's vaginal area to try to catch a urine sample. Garcia testified that she changed Christina's diaper on Thanksgiving morning around 8:00 a.m., and she did not notice anything unusual at the time.

{39} When Christina was taken to the emergency room, however, Dr. Steven Pilon, an E.R. physician, noted a scratch on Christina's perineum. After Christina's surgery, Yvonne Gabaldon, a nurse in the pediatric ICU, charted a small tear above Christina's rectum. Dr. Robert Katz, director of the pediatric ICU, testified that his resident Dr. Behnken had noted a tear around Christina's anus that day. Dr. Katz testified that he inspected the injury on Thanksgiving day, and that he paged Dr. Ornelas to come in and examine Christina.

{40} From this testimony, a rational jury could have concluded that Christina did not have the tear on November 23, and that she did have the tear some time after 8:00 a.m. on November 24. Further, based on the evidence recited above, the jury reasonably could have concluded that the Defendant was alone with Christina for twenty-five minutes on Thanksgiving day, and that was when the injury to Christina's perineum occurred. Dr. Ornelas also testified to perivaginal bruising and blood, which she associated with sexual abuse. While the testimony of Dr. Wilkie and Dr. Ornelas conflicts regarding the extent and the timing of the injury, it is within the jury's province to determine the credibility of testimony. Based on the above evidence, we conclude there was sufficient evidence to prove that the murder was committed during the commission of the underlying felony on which the jury based its verdict, criminal sexual contact.

### ISSUE TWO—SUFFICIENCY OF EVIDENCE FOR INTENTIONAL CHILD ABUSE RESULTING IN DEATH AND CRIMINAL SEXUAL CONTACT OF A MINOR

{41} The Defendant also argues that there was insufficient evidence to support his convictions for intentional child abuse result-

ing in death and criminal sexual contact of a minor. The same evidence that allowed the jury to convict Defendant of felony murder also allowed the jury to convict Defendant of intentional child abuse resulting in death. We will discuss below, however, that the convictions for both felony murder and intentional child abuse resulting in death would result in double jeopardy. Therefore, we need not address the issue of whether there was sufficient evidence to support the conviction of intentional child abuse resulting in death.

■■■ {42} We also hold that there was sufficient evidence to support Defendant's conviction of criminal sexual contact of a minor. While Defendant was acquitted of criminal sexual penetration and criminal sexual contact based on force to the vagina, the jury found Defendant guilty of criminal sexual contact based on force to the anus. As recited above, the jury heard testimony from various medical personnel that Christina had a scratch or tear near her anus. The jury saw autopsy photographs of this tear. The jury heard the testimony of an expert in sexual abuse, Dr. Ornelas, who testified that, in her opinion, Christina was the victim of sexual abuse which had occurred within twenty-four hours of the examination she performed on Christina prior to Christina's death. The jury heard testimony that the tear near Christina's anus was not noted by medical personnel the day before Thanksgiving when Christina had gone to the hospital because of illness. The jury heard testimony that neither Christina's mother nor her grandmother had noted any blood or tears near Christina's anus in the hours prior to the fatal blow to the head. The jury heard testimony that the Defendant was alone with the child for twenty to twenty-five minutes on Thanksgiving morning. Viewing the evidence in the light most favorable to upholding the verdict, we hold that a rational jury could have concluded that Defendant committed the crime of criminal sexual contact of a minor.

## ISSUE THREE—STATE'S UNTIMELY DISCLOSURE OF TAPE RECORDED INTERVIEWS OF WITNESSES

■■■ {43} Defendant argues that the State's failure to disclose the tape recorded interviews of Saavedra and Campos, until after the defense had cross-examined them, denied Defendant his right to prepare a defense, to confront and cross-examine witnesses, and to a fair trial. When evidence is disclosed for the first time during trial, this Court must consider the following factors to determine whether the error is reversible: (1) whether the State breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence. *State v. Sandoval*, 99 N.M. 173, 175–76, 655 P.2d 1017, 1019–20 (1982); *State v. Hall*, 107 N.M. 17, 19, 751 P.2d 701, 703 (Ct.App.1987).

{44} We assume the first three *Sandoval* factors were satisfied by the Defendant. Thus, the resolution of this issue hinges on whether the trial court cured the failure to timely disclose the evidence. In determining prejudice to a defendant "where the state initially deprives defendant of the evidence but later produces the evidence, the reviewing court should consider whether the failure to timely disclose the evidence was cured by the trial court." *Hall*, 107 N.M. at 19, 751 P.2d at 703 (citing *Sandoval*, 99 N.M. at 175, 655 P.2d at 1019). In this case, the trial court provided Defendant an opportunity to cure the failure to disclose the tapes when it allowed Defendant to re-examine any witness.

{45} In *Hall*, the Court of Appeals was presented with a similar issue. The defendant in *Hall* claimed he was denied due process by the prosecution's failure to disclose certain of his personal papers that he claimed were essential to help him identify and secure witnesses. 107 N.M. at 19, 751 P.2d at 703. The trial court had issued several orders demanding that the prosecutor produce the papers, but the papers were not produced until several days before trial. *Id.* The defendant moved the trial court for a continuance, but the trial court denied the motion, stating that it would instead consider a several day recess if, during trial, good

cause was presented by the defendant. *Id.* The defendant did not seek a recess during trial, and the Court of Appeals held that his inaction was "a cure of any prejudice that may have resulted from the untimely production." *Id.* Further, the court stated that it viewed the "inaction as a waiver of any claim that the trial court abused its discretion in not granting a continuance." *Id.*

{46} In this case, the trial court offered defense counsel an opportunity to cross-examine any witness who had been called to testify. Defense counsel chose not to recall any of the witnesses. Therefore, we hold that Defendant waived his claim that the late disclosure of the tapes prevented him from effectively cross-examining witnesses, because defense counsel failed to recall any witness when given the opportunity to do so.

## ISSUE FOUR—ADMISSION OF HEARSAY TESTIMONY OF DECEASED WITNESS

{47} At trial, Detective Ortiz testified about statements Joseph Sena made to her concerning a telephone conversation that Defendant claimed he had with Sena while Garcia was in the shower the morning of the murder. According to Detective Ortiz, Sena denied that he spoke with Defendant that morning. Sena died before trial, and Defendant objected to the introduction of Sena's statement as evidence, claiming that the statement was inadmissible hearsay.[1]

{48} The State argues that Sena's statement was admissible pursuant to Rule 11–804(B)(5) NMRA 1997 which allows a hearsay statement not covered by one of the many hearsay exceptions if the statement has equivalent circumstantial guarantees of trustworthiness, the statement is offered as evidence of a material fact, the statement is more probative on the point for which it is offered than any other evidence which the

proponent can produce through reasonable efforts, and the general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement. Rule 11–804(B)(5) is not operative unless the declarant is unavailable as a witness, *see* Rule 11–804(B), which was the case here since Sena died before trial.

{49} Sena's statement was offered to show the actions of Defendant during the relevant twenty-five minute time frame in which Garcia was in the shower; his statement was evidence of this material fact. Additionally, the statement is more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts. The Defendant argues that the Sena family phone records are the best evidence of what Sena did that day. The trial court found, however, that these records could not provide better evidence than Sena's own knowledge of his actions that day, and we will not disturb the trial court's findings on this point.

{50} Also, the interests of justice and the general purpose of the evidence rules are best served by admission of the Sena statement. The circumstances surrounding the statement indicate that the statement was trustworthy. Sena was a good friend of Defendant and it appears he had no motivation to lie about whether he talked to Defendant that morning. Sena was not a suspect in the case, and thus there would be no reason for the police to coerce a statement from Sena. Apparently, Sena had a clear memory about talking to Defendant that day, as he remembered that Defendant had called for him late that afternoon and had talked to Sena's mother. The statement was important for the jury to consider, as it went to the truth of

---

1. At trial, Defendant did not timely object to the admission of Sena's statement on confrontation grounds, nor did he timely object on general constitutional grounds; therefore, we do not address Defendant's confrontation concerns on appeal. *See State v. Lucero,* 104 N.M. 587, 591, 725 P.2d 266, 270 (Ct.App.1986) (holding that denial of the right to confrontation may not be raised for the first time on appeal where the defendant's hearsay objection did not sufficiently alert trial court to claimed constitutional error); *cf. State v.*

*Ross,* 1996 NMSC 031, 122 N.M. 15, 23, 919 P.2d 1080, 1088 (holding that confrontation issue was preserved for appellate review where the defendant timely objected on general constitutional grounds, in addition to evidentiary grounds, and distinguishing *Lucero* by noting that the defendant in that case made only evidentiary objections to hearsay evidence without suggesting that its admission would violate either the state or federal constitutions).

what Defendant claimed he was doing while Garcia was in the shower.

{51} Further, the statement's probative value is not substantially outweighed by its prejudicial effect to the Defendant. *See* Rule 11–403 NMRA 1997. Rule 11–403 guards against the danger of unfair prejudice against the defendant, but it does not necessarily shield the defendant from statements which may inculpate the defendant. *See State v. Woodward*, 121 N.M. 1, 6, 908 P.2d 231, 236 (1995) (citing 1 Kenneth S. Brown et al., *McCormick on Evidence* § 185, at 780 (John W. Strong ed., 4th ed.1992)). Sena's statement impeached Defendant's testimony that he was talking on the telephone for ten minutes while Garcia was showering; thus, the statement was highly probative. We cannot say that the trial court abused its discretion in finding that the statement was more probative than prejudicial. Moreover, we hold that the trial court did not abuse its discretion in admitting Sena's statement pursuant to Rule 11–804(B)(5).

## ISSUE FIVE—ADMISSION OF AUTOPSY PHOTOGRAPHS

{52} The trial court allowed the State to introduce two autopsy photographs of Christina. The defense objected to the admission of the photographs, claiming that they were not properly authenticated, irrelevant and unduly prejudicial. We hold that the trial court did not abuse its discretion in admitting the autopsy photographs.

{53} Photographic evidence must fairly and accurately represent the depicted subject in order to satisfy the foundation requirement for authentication of photographs. *See State v. Henderson*, 100 N.M. 260, 261, 669 P.2d 736, 737 (Ct.App.1983). The State elicited the testimony of Dr. Ornelas to authenticate the autopsy photographs. Defendant argues that Dr. Ornelas' testimony could not properly authenticate the photographs because Dr. Ornelas could not positively identify that the photographs were of Christina, and the State offered no other evidence to authenticate the photographs. Dr. Ornelas testified, however, that the photographs of Christina and the wound in Christina's perineum appeared substantially the same as when Dr. Ornelas had examined Christina prior to her death. The trial court found that the autopsy photographs were properly authenticated by Dr. Ornelas' testimony that the photographs accurately depicted Christina and the injury she observed on Christina's perineum. This testimony was sufficient to establish a foundation, and we cannot hold that the trial court abused its discretion in finding that the photographs were properly authenticated.

{54} Nor will we disturb the trial court's finding that the photographs were relevant evidence. "Photographs are relevant and admissible for the purpose of clarifying and illustrating testimony." *State v. Gilbert*, 100 N.M. 392, 399, 671 P.2d 640, 647 (1983). Defendant argued that the photographs were irrelevant because Dr. Ornelas testified that the appearance of Christina's injury in the autopsy photograph did not appear the same as the injury would appear on a child who is alive. According to Defendant, the photographs could not assist the jury because the photographs did not illustrate Christina's actual injury. However, Dr. Ornelas testified that while the muscle tone in a dead child is different from that of a living child, the injury she saw when she examined Christina was similar to that appearing in the autopsy photographs. Since the jury heard conflicting testimony from medical personnel and experts regarding the size of the tear in Christina's anal-perineum area, the autopsy photographs became particularly relevant to show the jury the appearance of the injury.

{55} Defendant also claims the autopsy photographs were unduly prejudicial. A trial court has great discretion in balancing the prejudicial impact of a photograph against its probative value. *State v. Pettigrew*, 116 N.M. 135, 139, 860 P.2d 777, 781 (Ct.App.1993). Given the relevance of the photographs in light of the varied testimony regarding the size of Christina's injury, the trial court did not abuse its discretion by finding these photographs to be more probative than prejudicial.

## ISSUE SIX—ADMISSION OF DEFENDANT'S PRIOR CONVICTION

{56} In 1995, Defendant plead guilty to possession of stolen property. The stolen

property was a 9–millimeter Uzi which was found under the seat of a car in an incident occurring in 1994. The crime of receiving a stolen firearm of less than $2500 in value is a fourth-degree felony. NMSA 1978, § 30–16–11(I)(1987). The basic punishment for a fourth-degree felony is eighteen months imprisonment. NMSA 1978, § 31–18–15(A)(6) (1994). Over the defense's objection, the trial court allowed the State to cross-examine Defendant about the conviction. Defendant argues that the trial court abused its discretion by allowing the State to cross-examine Defendant on his prior conviction for possession of a stolen firearm. Defendant claims that the probative value of the evidence did not outweigh its prejudicial effect. *See* Rule 11–609 NMRA 1997; Rule 11–403 NMRA 1997. We disagree.

[21] {57} The admission of a prior conviction of a witness is reviewed on appeal only for abuse of discretion. *State v. Trejo,* 113 N.M. 342, 347, 825 P.2d 1252, 1257 (Ct. App.1991). Felony convictions punishable by imprisonment of a year or more, and crimes involving dishonesty are probative of credibility and may be admissible to impeach defendant if the probative value of admitting the evidence outweighs its prejudicial effect to the defendant. Rule 11–609(A). We need not address whether the crime of receiving a stolen firearm is a crime involving dishonesty, since Rule 11–609(A)(1) "contemplates admission into evidence of felony convictions, regardless of whether they concerned dishonesty or false statement." *State v. Lucero,* 98 N.M. 311, 313, 648 P.2d 350, 352 (Ct.App. 1982).

{58} The trial court should consider the following factors when deciding whether to admit evidence of a felony conviction under Rule 11–609(A)(1):

(1) the nature of the crime in relation to its impeachment value as well as its inflammatory impact; (2) the date of the prior conviction and witness's subsequent history; (3) similarities, and the effect thereof, between the past crime and the crime charged; (4) a correlation of standards expressed in Rule 609(a) with the policies reflected in [Rule 11–404 NMRA 1997]; (5) the importance of the defendant's testimo-

ny, and (6) the centrality of the credibility issue.

*Lucero,* 98 N.M. at 313–14, 648 P.2d at 352–53 (citations omitted).

{59} In this case, credibility was a critical and central issue for the jury to consider. Defendant's version of what occurred varied greatly from the version Garcia testified to at trial. Moreover, the crime used to impeach Defendant was not similar to the charges Defendant faced at trial, and Defendant had only recently plead guilty to the felony. Keeping the above factors in mind, we cannot hold that the trial court abused its discretion by allowing the State to cross-examine Defendant on his prior conviction.

## ISSUE SEVEN—PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

{60} At trial, the prosecutor referred to the stolen firearm as a "tec-9 machine gun." On appeal. Defendant claims the reference was inflammatory and was being used as substantive evidence of Defendant's guilt. Defendant argues that this reference amounted to prosecutorial misconduct that denied Defendant due process and a fair trial. Again, we disagree.

{61} As explained above, the State was allowed by the trial court to cross-examine Defendant about his prior conviction. The State asked Defendant whether he had pled guilty to receiving stolen property with a firearm, to which Defendant replied "yes." On redirect, defense counsel elicited Defendant's testimony that the crime was possession of a stolen firearm, rather than possession of stolen property with a firearm, as the prosecutor had characterized it. Defense counsel, over objection, was permitted to ask questions of Defendant which would allow Defendant to explain the circumstances of the possession of a stolen weapon. On recross, the State asked if the gun was a 9 millimeter Uzi, to which Defendant answered "[i]t was an Uzi–Tec-9." Since the trial court allowed Defendant the opportunity to explain the circumstances of the conviction on redirect, the defense opened the door for the State to also ask about the facts of the

crime. Based on Defendant's answer, it was not improper for the prosecutor to refer to the firearm in closing argument.

{62} Moreover, the State did not use this conviction as substantive evidence of Defendant's guilt. In closing argument, the defense characterized Defendant as "the hardest working boy you'll ever meet." Then the defense stated: "Now sure, he had a little problem. He was making out with his girlfriend, and they found a gun in his car. And the gun turned out to be stolen. That's about the only thing, and if he goes through life in Albuquerque with only that, let me tell you, he merits an award the way the youth goes in this town."

{63} In rebuttal, the State argued that the defense was trying to portray Defendant as "this guy, hard working you know, doesn't really get in trouble. He was caught with a Tec–9, Tec–9, nine millimeter. No big deal if that's all there is … This is not a mild-mannered young man. This is not the saint the defense wants you to see. This man raped and killed this baby." We agree with the State that the prosecutor's closing argument was a rebuttal of the defense's characterization of Defendant as a hard-working man who had only a single run-in with the law. The defense's reference to Defendant's character and conviction clearly opened the door for the prosecution to do the same. Thus, there was no error in the prosecutor's remarks.

## ISSUE EIGHT—DOUBLE JEOPARDY

{64} Defendant argues that his convictions for felony murder and criminal sexual contact of a minor, and for felony murder and intentional child abuse resulting in death, are improper multiple punishment and violate his protection against double jeopardy. The Double Jeopardy Clause protects against both successive prosecutions and multiple punishments for the same offense. *Swafford v. State*, 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991). The State has ac-

knowledged that, should we affirm the felony murder conviction, the conviction for intentional child abuse resulting in death should be vacated.[2] Because we affirm Defendant's felony murder conviction, we remand this case to the district court with the instruction that Defendant's conviction for intentional child abuse resulting in death be vacated.

{65} The more problematic claim of double jeopardy involves Defendant's convictions for felony murder and criminal sexual contact. Defendant claims that under New Mexico law, he cannot be convicted of both felony murder and the underlying felony. *See State v. Contreras*, 120 N.M. 486, 491, 903 P.2d 228, 233 (1995) (holding that double jeopardy was violated where defendant's conduct for murder and underlying felony of armed robbery was unitary).

{66} We use the two-pronged *Swafford* test to analyze Defendant's double jeopardy claim. 112 N.M. at 13, 810 P.2d at 1233. The court first inquires "whether the conduct underlying the offenses is unitary," that is, whether the same conduct violates two or more different statutes. *Id.* If the conduct is unitary, the court applies the second inquiry, asking whether the Legislature intended to impose multiple punishments for the unitary conduct. *Id.* We answer the question of whether the Legislature intended multiple punishments for unitary conduct by asking whether each statute proscribing the offense requires proof of a fact the other does not. *Id.* at 14, 810 P.2d at 1234 (adopting in part the elements test articulated by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)). If "one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes …." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234.

{67} The issue of unitary conduct in this case is pivotal. If the conduct of Defendant

---

2. In *State v. Pierce*, 110 N.M. 76, 85, 792 P.2d 408, 417 (1990), we held that it was improper multiple punishment for a defendant to be sentenced for child abuse resulting in death and first-degree murder where the state did not charge or offer proof that the acts of child abuse occurred at a time period different from the

incident which resulted in the child's death. In its Answer Brief, the State recognized that *Pierce* controls and at oral argument, the State conceded that the conviction for intentional child abuse resulting in death should be vacated should the court affirm the felony murder conviction.

is deemed unitary, Defendant could not be convicted for both felony murder and criminal sexual contact of a minor since the underlying offense of criminal sexual contact necessarily would be subsumed as an element of the offense of felony murder. The resolution of the unitary conduct analysis turns upon which versions of the events—Defendant's or the State's—is best supported by the evidence. *See State v. Cooper*, NMSC 22,504, ¶ 59, 124 N.M. 277, 949 P.2d 660 (1997).

{68} We have stated that conduct is not unitary "if the defendant commits two discrete acts violative of the same statutory offense, but separated by sufficient indicia of distinctness." *Swafford*, 112 N.M. at 13, 810 P.2d at 1233. The court may consider as "indicia of distinctness" the separation of time or physical distance between the illegal acts, "the quality and nature" of the individual acts, and the objectives and results of each act. *Id.* at 13–14, 810 P.2d at 1233–34. "While felony murder requires that another felony has occurred, 'if the conduct is separate and distinct, inquiry is at an end.'" *State v. Kersey*, 120 N.M. 517, 523, 903 P.2d 828, 834 (1995) (citing *Swafford*, 112 N.M. at 14, 810 P.2d at 1234 and holding that offenses of kidnapping and felony murder were not unitary because conduct required to establish kidnapping was complete before act of murder).

{69} In this case, the State concedes that there was no significant separation of events by time or space. The evidence shows that the criminal sexual contact which caused the tear occurred within the same twenty-five minutes of the fatal blow to the head. Although the acts resulting in the convictions for felony murder and criminal sexual contact may have been committed during a brief chain of events, we agree with the State that the acts were distinct and separate. *Cf. Cooper*, NMSC 22,504, ¶¶ 60–62, 124 N.M. 277, 949 P.2d 660 (1997) (holding that acts leading to convictions for aggravated battery and first degree, felony murder were not unitary where initial act of battery did not result in victim's death, and thus the act of battery was separate conduct distinguishable from the acts resulting in murder); *State v. Livernois*, 1997 NMSC 019, ¶ 21, 123 N.M. 128, 934 P.2d 1057 (holding that acts leading to convictions for aggravated burglary and first-degree, felony murder were not unitary where shooting occurred shortly after defendant completed the offense of aggravated battery by entering a bowling alley with the requisite intent to commit a felony while armed). Here, the quality and the nature of the acts, as well as the objects and results involved, are different. The act leading to the offense of criminal sexual contact resulted in injury to Christina's genital area. On the other hand, the act leading to the offense of felony murder involved an intentional act of killing or creating a strong probability of death or great bodily harm to Christina, and resulted in blunt and fatal force to Christina's head.

{70} The fatal blow to Christina's head was caused by conduct separate from the contact to Christina's genital area. Neither contact was necessary to accomplish the other. This case is unlike *State v. Campos*, 1996 NMSC 043, 122 N.M. 148, 921 P.2d 1266, where the predicate felony of criminal sexual penetration was the single act that caused the victim's death. Here, the conduct involved in the criminal sexual contact was separate conduct that did not cause Christina's death. We conclude that Defendant's act leading to the conviction of criminal sexual contact (causing injury to Christina's perineum) was a distinct and separate act when compared to his act leading to the conviction of felony murder (causing injury to Christina's head). Thus, Defendant's conduct was not unitary and his conduct constituted two separate acts for which the Legislature has proscribed two separate offenses.

{71} The version of the events best supported by the evidence is that Defendant's acts of criminal sexual contact and felony murder were not unitary. Therefore, we need not address the second *Swafford* factor. Defendant may be convicted and sentenced for both felony murder and criminal sexual contact of a minor.

CONCLUSION

{72} We affirm Defendant's convictions for felony murder and criminal sexual contact in the third degree. We remand this case to

the district court with the directions that Defendant's conviction for intentional child abuse resulting in death be vacated, and that Defendant's judgment and sentence should be amended to reflect sentences for both criminal sexual contact of a minor and felony murder.

{73} **IT IS SO ORDERED.**

FRANCHINI, C.J., BACA and MINZNER, JJ., and M. CHRISTINA ARMIJO, J., New Mexico Court of Appeals (sitting by designation), concur.

