**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 31 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHRISTOPHER MORA,

      Petitioner - Appellant,

v.

JOE WILLIAMS, Warden, Lea County
Correctional Facility,

      Respondent - Appellee.

No. 02-2216
(D. New Mexico)
(D.Ct. No. CIV-01-748-JP/RLP)

---

**ORDER AND JUDGMENT**[*]

---

Before **SEYMOUR**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

---

Paramedics transported the limp and unresponsive body of twenty-three

month old Christina Sierra to the emergency room Thanksgiving Day morning,

November 24, 1994. Christina was pronounced dead the next morning at 11:00

a.m. The cause of death was severe head trauma. Only two people were present

in the hours immediately preceding her injury—Andrea Garcia, the child's

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

mother, and Christopher Mora, Garcia's live-in boyfriend. Each accused the other of being alone with Christina with the opportunity to cause the injury leading to her death. Mora was arrested and charged with Christina's death.

After an eight day jury trial, Mora was convicted of felony murder (with criminal sexual contact of a minor as the underlying felony offense), criminal sexual contact in the third degree, and intentional child abuse resulting in great bodily harm or death. On appeal to the New Mexico Supreme Court, his conviction of intentional child abuse resulting in death was vacated. *State v. Mora*, 950 P.2d 789, 805-06 (N.M. 1997). The court concluded "the convictions for both felony murder and intentional child abuse resulting in death would result in double jeopardy." *Id*. at 800. However, his convictions for felony murder and criminal sexual assault were affirmed. *Id*. at 805.

Mora then filed a petition for writ of habeas corpus in state court, which was denied after an evidentiary hearing. His petition for writ of certiorari to the New Mexico Supreme Court was granted on a single issue, whether Mora's counsel had a conflict of interest. The writ was quashed after full briefing and oral argument.

After exhausting his state remedies, Mora petitioned for a writ of habeas corpus under 28 U.S.C. § 2254(a) to the United States District Court for the District of New Mexico, asserting the same grounds for relief presented to the

state court: (1) insufficiency of the evidence for both the felony murder and the criminal sexual contact convictions, and (2) ineffective assistance of counsel based on counsel's conflict of interest, failure to recall a witness, and the failure to make pertinent objections at trial. The district court denied his petition as well as his subsequent request for a certificate of appealability (COA). We granted a COA to consider the full merits of his habeas petition. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we AFFIRM.

## FACTUAL BACKGROUND

Mora moved into Garcia's apartment in September 1994. Garcia's mother, Virginia Saavedra, also lived with Garcia until mid-October 1994. In November 1994, Christina, a previously healthy baby, began suffering from a multitude of illnesses, which included bruises, herpes dermatitis (blisters in the mouth), respiratory infection, and pneumonia symptoms. These illnesses caused Christina to be seen by her doctors several times, including a hospital stay from November 13 through 17, 1994, and a visit to the medical clinic on November 23, the day before her fatal injury.

At trial, Garcia and Mora gave conflicting testimony about what occurred in the hours just before Christina's injury. Garcia testified Christina, although still ill, was otherwise talking and acting normally on Thanksgiving morning. Garcia stated she and Mora got out of bed at the same time. She went to change

-3-

Christina's diaper in the bedroom, then all three watched the Thanksgiving parade on the television in the living room. After about an hour, Garcia left Christina with Mora while Garcia showered for her normal twenty to twenty-five minutes. As Garcia left the bathroom, she saw Mora walking down the hall carrying Christina. He said he was putting her to bed because she fell asleep. Garcia thought this was odd because Christina did not nap in the morning. However, upon quickly peeking in the bedroom, Christina appeared to be sleeping. Later, after Garcia spoke with her mother on the telephone, she asked Mora to fix an egg for Christina while she went to get the child out of bed. Instead, Mora went with her to the bedroom. Both observed that Christina was alarmingly lethargic and unresponsive. Garcia called 911 and the paramedics arrived shortly thereafter.

Mora's testimony about the facts prior to the arrival of the ambulance differs. He testified he and Garcia were having sex when Christina began crying. He insisted Garcia tend to Christina, even though she did not want to. Christina was crying loudly as Garcia took her to the living room. From the bedroom, he heard Christina cry or scream and then become silent. When he went into the living room approximately twenty minutes later, it appeared Christina was sleeping in her stroller. Garcia gave him a "scared look." (2d Supp. App., Vol. VII at 60.) Garcia went to the kitchen and made cereal for Christina, but the child would not eat. Garcia then told him she was going to take a shower. Soon after

-4-

Garcia left the room, he received a call from his friend, Joseph Sena, whom he spoke with for about ten minutes. Later, Mora put Christina in her bed because she was still sleeping. After Garcia finished dressing and went to wake Christina, Mora went to the kitchen to make an egg for the child. There, he heard Garcia loudly tell Christina to get up. He went into Christina's room to find out what was wrong. Seeing Christina was very pale, he uncovered her and saw she was having difficulty breathing. He told Garcia to call the ambulance.

What happened during the remainder of the day is uncontested. Garcia accompanied Christina in the ambulance, while Mora dressed and arrived at the hospital about forty minutes later. Doctors and nurses in the emergency room discovered Christina had severe head trauma and a tear or scratch on her perineum (the flesh between the vaginal and anal openings.) Dr. Nevin Baldwin, the attending neurosurgeon, operated at approximately 11:00 a.m. to remove the blood clot caused by the head trauma. After surgery, Christina was taken to the intensive care unit where medical personnel notified Dr. Robert Katz, the director of the pediatric unit, of the tear on Christina's perineum. Dr. Katz performed an examination and then called Dr. Renee Ornelas, a pediatric sexual abuse expert, to do a more thorough exam. Christina died from her head injury the next day.

**DISCUSSION**

## I. Standard of Review

All of Mora's appellate claims were adjudicated on the merits in state court. Therefore, we grant habeas relief only if Mora can establish the state court's decision was: (1) "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" or (2) "'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *See Spears v. Mullin,* 343 F.3d 1215, 1225 (10th Cir. 2003) (quoting 28 U.S.C. § 2254(d)(1) and (2) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *cert. denied*, 124 S.Ct. 1615 (2004). Further, we presume the state court factual findings are correct and place the burden on Mora to rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II. Sufficiency of the Evidence

Mora contends the evidence adduced at trial was insufficient to convict him beyond a reasonable doubt. He maintains the New Mexico Supreme Court failed to correctly apply the inquiry required by *Jackson v. Commonwealth of Va.*, 443 U.S. 307, 324 (1979). Whether the evidence is insufficient to establish guilt beyond a reasonable doubt is a question of law reviewed de novo. *See Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir.) (challenge to the sufficiency of the

-6-

evidence is properly viewed as a legal question where appellant does not contend the state court's factual findings are erroneous but argues the court's ultimate conclusion—that the evidence is sufficient to support his conviction—constitutes an unreasonable application of *Jackson*), *cert. denied*, 124 S.Ct. 562 (2003). Nevertheless, we apply a deferential standard and review only to determine whether the state court's application of *Jackson* was unreasonable. *Id*. at 1156. The decision of the state court will meet the AEDPA test unless the "'analysis [is] so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated.'" *Id*. (quoting *Cruz v. Miller,* 255 F.3d 77, 87 (2d Cir. 2001)).

Mora begins by arguing the New Mexico Supreme Court did not apply the correct standard because it did not specifically cite to *Jackson* and because it failed to include the words "beyond a reasonable doubt" when it determined (1) "a rational jury could have inferred . . . that Mr. Mora was the person who inflicted the injuries," and (2) "a rational jury could have found . . . that Mora committed the crime of criminal sexual contact of a minor under circumstances dangerous to human life." (Appellant's Br. at 19 (quoting *Mora*, 950 P.2d at 797).) Mora's argument is based on a piecemeal reading of the New Mexico Supreme Court's opinion. He ignores the court's recitation of the proper standard and its rigorous analysis of the facts prior to announcing its conclusions. *Mora*, 950 P.2d at 792-800. The New Mexico Supreme Court relied on its own cases

adopting *Jackson's* sufficiency of the evidence standard. *Id.* at 797 (citing *New Mexico v. Sutphin*, 753 P.2d 1314, 1319 (N.M. 1988) and *State v. Hernandez*, 846 P.2d 312, 332 (N.M. 1993)). It explained that, in a case involving circumstantial evidence, "reasonable doubt is not precluded unless circumstantial evidence viewed in the light most favorable to the State gives rise to an equally reasonable inference of innocence." *Mora*, 950 P.2d at 797 (citing *State v. Apodaca*, 887 P.2d 756, 760 (N.M. 1994)). Whether or not it cited *Jackson*, the New Mexico Supreme Court applied the proper standard—whether a rational trier of fact could find guilt beyond a reasonable doubt. We proceed to examine Mora's individual offenses to determine whether the New Mexico Supreme Court's decision was contrary to or an unreasonable application of *Jackson. See* 28 U.S.C. § 2254(d)(1).

### A. Criminal Sexual Contact

Mora argues there was insufficient evidence for a jury to find him guilty beyond a reasonable doubt of criminal sexual contact of a minor. New Mexico law defines "criminal sexual contact of a minor" as "the unlawful and intentional touching of or applying force to the intimate parts of a minor . . . ." N.M. STAT. ANN. § 30-9-13 (1991). It is a third-degree felony when it is perpetrated on a child under thirteen years of age. *Id*.

Although the evidence was circumstantial, it was sufficient to allow a jury

to find Mora guilty of this charge beyond a reasonable doubt. The timing of Christina's injuries is a critical consideration. Medical personnel testified they had seen no tear near Christina's anus when she was at the hospital the day before Thanksgiving and Garcia testified she noticed nothing irregular when she changed Christina's diaper the morning of November 24. But when Christina arrived at the emergency room later that day, various physicians testified they saw a tear on Christina's perineum, which eventually led hospital physicians to believe she was sexually abused.

Mora argued the tear could have been the result of Christina's medical care. However, Dr. Ornelas testified it extended from the anal ring muscle to the perineum and could only have been caused by intentional sexual contact. She further testified the injury was inflicted within the prior twenty-four hours and it was unlikely any medical procedures could have caused damage to Christina's genital area.[1] In addition, the nurse who attempted to obtain a urine sample from Christina on November 23 testified she did not tear or scratch Christina's genitalia when she placed and removed the urine collector. Even Dr. James

---

[1] Dr. Ornelas testified she examined Christina on Thanksgiving Day, November 25. Mora argues this discrepancy (Thanksgiving Day was November 24) means Dr. Ornelas examined Christina on November 25. Therefore, since Christina was in the hospital twenty-four hours before Dr. Ornelas' examination, Mora contends her testimony is more consistent with the tear occurring at the hospital. We are not persuaded Dr. Ornelas' mistake as to the date of Thanksgiving negates the jury's finding of guilt.

Wilkie, Mora's expert, testified he had never seen such a tear and had never caused a similar tear as a result of performing medical procedures. Given the timing and the nature of the injury, the only persons alone with Christina were Mora and Garcia. The jury was entitled to accept Garcia's version of the facts, and as a result, the evidence points to but one person, Mora. Thus, the state court's conclusion was a reasonable application of law and relevant fact.

**B. Felony Murder**

Under New Mexico law, felony murder requires (1) intent to kill, or (2) knowledge that one's actions create a strong probability of death or great bodily harm, or (3) action that is greatly dangerous to the lives of others. *State v. Griffin*, 866 P.2d 1156, 1162 (N.M. 1993); *State v. Ortega*, 817 P.2d 1196, 1208 (N.M. 1991). Additionally, the prosecution must prove the killing occurred during the commission of an independent inherently dangerous felony. *State v. Campos*, 921 P.2d 1266, 1272 (N.M. 1996). Mora argues there was insufficient evidence to establish beyond a reasonable doubt that: (1) he had the requisite intent, (2) the underlying felony is a dangerous felony, or (3) the fatal blow to Christina's head occurred during the commission of the underlying felony.

**(1) Intent to Kill**

All evidence presented established Christina's head injury was caused by an intentional blow. Dr. Wilkie, testifying for Mora, opined the fatal injury was

intentionally inflicted. A neuroradiology expert, Dr. Blaine Hart, compared the x-rays of Christina's healthy skull taken on November 14, 1994,[2] to the x-rays and CAT scan of November 24. He testified that the skull fracture could not have been caused by the child falling or being dropped a few feet; it was caused by either striking the skull with a hard object or hitting the skull against a hard object. Dr. Baldwin, the neurosurgeon who operated on Christina, testified that Christina's fracture implied a shattered skull, which is "a very, very high impact injury." (2d Supp. App., Vol. V at 26.)

Because the blow to Christina's head was intentionally inflicted, the jury could deduce the person who inflicted the blow either intended to kill Christina or acted in a manner greatly dangerous to her life. The question, then, is whether sufficient evidence was presented to allow the jury to conclude Mora inflicted that injury.

The jury heard testimony of various inconsistent statements given by Mora regarding the hours preceding Christina's arrival at the hospital. He told police officers just eight days after Christina suffered the head trauma that Christina was

_____

[2] The November 14 x-rays were taken because of Christina's recent health problems. These x-rays revealed no indication of a skull fracture at that time. Dr. Hart testified Christina's head injury occurred within twenty-four hours of the CAT scan taken on November 24, and the brain swelling would have occurred over minutes or hours, not weeks. Dr. Baldwin testified the bleeding in Christina's head began less than two hours before arrival at the hospital.

-11-

awake and she ate cereal after he got up. Randy Chavez, Garcia's cousin, testified Mora originally told him at the hospital that Christina fell asleep on the couch *while* Garcia was showering so he put her to bed. Mora later told the family that both he and Garcia put Christina to bed when she fell asleep. However, at trial he testified Christina was "asleep" and did not eat from the time he got up to the time the paramedics arrived. (2d Supp. App., Vol. VII at 61.) He also told the jury he talked to his friend, Joseph Sena, for ten minutes while Garcia was showering. In his interview with the police, Sena denied he had a telephone conversation with Mora.[3]

Other evidence presented to the jury also contradicted Mora's factual account at trial. He testified he began to prepare an egg for Christina by putting grease in a frying pan and placing the pan on the stove. Photographic evidence of the kitchen taken the day of Christina's fatal injury demonstrated the absence of a frying pan on the stove, in the sink, or elsewhere in the kitchen. Mora also testified Garcia spent time after her shower putting on make-up, but in a photograph taken of her at the hospital she was not wearing make-up. After reviewing the entire record, it is clear the New Mexico Supreme Court did not unreasonably apply the *Jackson* standard to the intent element.

---

[3] Sena was unavailable to testify because he died prior to the trial. The transcript of his interview with the police was read into the record.

### (2) Inherently Dangerous Felony

Mora was convicted of the underlying felony of criminal sexual contact of a minor. A felony murder conviction in New Mexico requires proof beyond a reasonable doubt that the underlying felony was 1) inherently dangerous, or 2) the circumstances surrounding its commission were dangerous to a human life. *See Ortega*, 817 P.2d at 1205. The underlying felony in this case was a third-degree felony and not considered inherently dangerous. *Id*. Therefore, the jury was required to determine whether it was committed in a manner dangerous to human life, considering both the nature of the felony and the circumstances surrounding its commission. *Id.* Mora argues there was insufficient evidence to support the jury's finding that he committed criminal sexual contact of a minor in a manner dangerous to human life.

Again, our review of the record reveals ample evidence upon which the jury could conclude the criminal sexual contact occurred in circumstances dangerous to Christina's life. Christina was only twenty-three months old and in a weakened condition due to recent illnesses. The jury heard conflicting testimony about the severity of the anal/perineum tear. Dr. Ornelas testified the tear was recently inflicted, was deep, and extended from the anal ring muscle onto the perineum. Mora argues this testimony cannot be used to infer dangerousness to human life because the jury did not find him guilty of sexual penetration and Dr. Ornelas

-13-

testified the tear could only be caused by penetration. He maintains we must instead look to the testimony of other witnesses who did not find the injury to be as severe. We disagree. While Dr. Ornelas' conclusion regarding the precise *cause* of the tear was clearly not accepted by the jury, it still could find her *description* of the wound to be the most credible. Thus, given Dr. Ornelas' description of the severity of the tear, a rational jury could have concluded beyond a reasonable doubt that the acts resulting in the tear, whether or not penetration occurred, could be dangerous to her life.

In addition, as the New Mexico Supreme Court noted, Mora only had twenty to thirty minutes in which to commit his sexual contact of Christina. Time restraints, coupled with Garcia's relative proximity, could have increased the danger to Christina's life. *Mora*, 950 P.2d at 797. If Christina screamed out in pain when her anal ring and perineum were torn, as Dr. Ornelas testified would have happened, Mora would have had to quiet her quickly. The jury could have relied on these circumstances and made similar inferences in determining the criminal sexual contact of Christina was dangerous to her life. We recognize the evidence in this case supporting Mora's convictions is circumstantial and several inferences from the evidence are required to reach the jury's result. However, the verdict does not require "piling inference on top of inference." *See United States v. Horn,* 946 F.2d 738, 741 (10th Cir. 1991). After careful examination of the

record in this case, we conclude the New Mexico Supreme Court did not unreasonably apply *Jackson* in finding sufficient evidence to support this element of Mora's felony murder conviction.

### (3) Death Caused During Commission of Criminal Sexual Contact of a Minor

Mora contends there was no evidence demonstrating that his commission of "criminal sexual contact, if it occurred at all, occurred at or near the time of the alleged murder." (Appellant's Br. at 27.) Again, we disagree. There was sufficient evidence allowing a reasonable inference that the crimes were committed within twenty to twenty-five minutes of each other. Dr. Baldwin testified the brain injury occurred between 9:00 a.m. and 11:00 a.m. on November 24. Dr. Ornelas testified the tear on Christina's perineum was also recent. Several witnesses testified neither injury was present the day before Thanksgiving and Garcia saw nothing early that morning. However, both injuries were discovered upon Christina's arrival at the hospital. Thus, the jury could conclude the tear was inflicted sometime between 8 a.m. and 9:30 a.m. Because Mora was alone with Christina for only the twenty to thirty minutes while Garcia was showering, the jury could have concluded, beyond a reasonable doubt, that it was during this time Mora engaged in criminal sexual contact with Christina and it was during this act he inflicted the trauma to her head that resulted in her death. We find no error in the New Mexico Supreme Court's conclusion that the

evidence presented at trial was sufficient for a rational jury to find Mora guilty beyond a reasonable doubt of felony murder.

## III. Ineffective Assistance of Counsel

Mora also contends the New Mexico Supreme Court and the district court erred in concluding he received effective assistance of counsel at trial. He claims he demonstrated ineffective assistance due to: (1) an actual conflict with his attorney; (2) counsel's failure to recall a hostile witness to impeach Garcia; (3) counsel's failure to object to the prosecutor's use of evidence of Mora's prior felony conviction; (4) counsel's failure to make a timely Confrontation Clause objection to hearsay testimony from a deceased person; and (5) the State's delay in accusing Mora's attorney of suborning perjury.

A habeas petitioner's allegation that his trial counsel provided ineffective assistance is reviewed under the standard identified by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). *See also Romano v. Gibson,* 278 F.3d 1145, 1151 (10th Cir. 2002) (applying *Strickland*). Under *Strickland,* Mora must satisfy a two-part test to prevail. First, he must demonstrate that his attorney's "performance was deficient" and "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687-88. In applying this test, we give considerable deference to an attorney's strategic decisions and "recognize that counsel is strongly presumed to have rendered adequate assistance and made all

-16-

significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Second, Mora must demonstrate he was prejudiced by counsel's deficient performance, which requires a showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 687, 694.

In certain Sixth Amendment contexts, however, prejudice is presumed. *Id*. at 692. "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice," as "are various kinds of state interference with counsel's assistance." *Id*. at 692 (citing *United States v. Cronic,* 466 U.S. 648, 659, n.25 (1984)). In addition, *Strickland* identified "[o]ne type of actual ineffectiveness claim [that] warrants a similar, though more limited, presumption of prejudice." *Id*. When counsel is burdened by an actual conflict of interest, counsel's duty of loyalty comes into question. *Id*. In that case, "[p]rejudice is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Id*. (citation omitted). In the end, however, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. With these standards in mind, we review Mora's claims.

### A. Conflict of Interest and Deliberate Interference

In chambers, just before Mora was to testify, the State informed the court and the defense that a police officer inadvertently overheard Leon Taylor, Mora's lead counsel, tell Mora "[y]ou're going to have to lie." (2d Supp. App. Vol. VII at 31-32.) The state had this information several days before Mora was to testify but did not immediately bring it to the attention of the court. It decided to accuse counsel of subornation of perjury only if Mora actually took the stand. When the state made its announcement to the court, Taylor vigorously denied the accusation and Mora confirmed he was not told to lie. Nevertheless, the State wanted to call the officer who heard the remark in rebuttal if Mora testified.

After listening to the arguments of counsel, the trial court confirmed the State was not going to use this information in Mora's cross-examination and deferred ruling on the rebuttal witness issue until after Mora testified. On direct examination, Taylor asked Mora if his testimony was the truth and if anyone had told him to lie. On redirect, Taylor again asked Mora if he was telling the truth. Ultimately, the State did not pursue the issue and run the risk of a mistrial.

In his state habeas petition, Mora raised two claims from these facts. First, he claimed the State's allegation against Taylor created a direct and actual conflict of interest between Mora and Taylor that adversely affected Mora's representation. Second, he claimed the State's timing in disclosing the allegation

-18-

amounted to prosecutorial misconduct. At the evidentiary hearing on the habeas issues, Mora's counsel reformulated the second claim in opening argument. Citing to *United States v. Cronic,* 466 U.S. 648 (1984), he asked the court to "apply the law regarding a presumption of prejudice whenever the state deliberately interferes with a defendant's constitutional right to the effective assistance of counsel." (Appellant's App., Vol. II at 335.) The state court determined there was no actual conflict of interest because it "was in the interests of both Taylor and Mora to show that both were honest." (Appellant's App., Vol. I at 45). Finding no conflict and no ineffective assistance of counsel, the court did not address Mora's claim of prosecutorial misconduct or his alternative claim, deliberate interference with effective assistance of counsel.

### (1) Conflict of Interest

Mora contends the criminal allegation against Taylor (suborning perjury) created an actual conflict of interest that adversely affected counsel's representation. "An actual conflict of interest results if counsel was forced to make choices advancing other interests to the detriment of his client. Without a showing of inconsistent interest, any alleged conflict remains hypothetical, and does not constitute ineffective assistance." *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998) (citations omitted). Even if a defendant shows his lawyer had interests divergent from his own, he must also "establish that the

conflict of interest adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 174 (2002). "'[U]ntil . . . a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.'" *Id*. at 175 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). *See Moore v. United States*, 950 F.2d 656, 660 (10th Cir. 1991).

Mora suggests counsel's reaction to the prosecution's allegation–his demand to confront the witness and his threat to sue for defamation–demonstrates that his primary interest was no longer Mora's representation but his own interests in avoiding criminal or disciplinary action. Even assuming this argument is sufficient to raise an actual conflict, the record is devoid of any adverse effect on Mora's representation.

Mora cites to two cases that he suggests are applicable to the facts in his case: *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991), and *United States v. Greig*, 967 F.2d 1018 (5th Cir. 1992).[4] Each is distinguishable because, unlike

---

[4] He also cites to two Second Circuit cases, *United States v. Cancilla*, 725 F.2d 867 (2d Cir. 1984), and *United States v. Fulton*, 5 F.3d 605 (2d Cir. 1993). The Second Circuit applies a *per se* violation of the Sixth Amendment in two limited circumstances: (1) "where the defendant's counsel was unlicensed" and (2) "when the attorney has engaged in the defendant's crimes." *Fulton*, 5 F.3d at 611. When applied, the *per se* rule eliminates the defendant's need to show that the conflict adversely affected the lawyer's performance as required by *Cuyler*. *Id*. The Second Circuit's *per se* rule has not been adopted by this Court and has been expressly rejected by the Seventh Circuit. *United States v. Wallace*, 276 F.3d 360, 368 (7th Cir), *cert. denied*, 536 U.S. 924 (2002). Indeed,

here, the defendant was able to demonstrate specific instances in the record where his interests were compromised.

For example, in *Moore*, defense counsel was hired and paid by Cox, who was implicated in the same drug conspiracy as the defendant. *Moore*, 950 F.2d at 658. Counsel allegedly told the defendant to plead guilty and falsely implicate someone other than Cox. *Id*. Later, when the lie was discovered, the government charged the defendant with perjury. *Id*. at 657-58. The same counsel told the defendant to plead guilty to the perjury charge. *Id*. at 658. On appeal, we held that the two actual conflicts claimed by the defendant—counsel's alleged personal involvement in suborning perjury at the first plea hearing and his alleged representation of Cox—if true, sufficiently demonstrated counsel's motivation in urging the defendant to plead guilty was to avoid discovery of his own involvement in suborning perjury, the representation of Cox, or both. *Id*. at 658, 660. Because counsel vigorously disputed the allegations, we remanded for an evidentiary hearing regarding the conflict of interest claims. *Id*. at 661.

In *Greig*, the defendant and counsel were accused of meeting, prior to trial, with a co-conspirator who had agreed to be a government witness. *Greig*, 957

---

one may question the remaining viability of a *per se* rule in light of the Supreme Court's decision in *Mickens, supra*. Nevertheless, even in light of the *per se* rule, both cases specifically found the defendant's representation was adversely affected. *Fulton*, 5 F.3d at 610; *Cancilla*, 725 F.2d at 870.

F.2d at 1020-21. The meeting did not include the co-conspirator's counsel. *Id.* Because the attorney "was open to an indictment for obstruction of justice based on [the] contacts with [the co-conspirator]," the Fifth Circuit determined there was an actual conflict between the defendant and his counsel. *Id.* at 1022. The court also held an adverse effect was demonstrated when counsel failed to cross-examine the co-conspirator's damaging testimony regarding the meetings. *Id.* at 1024-25. In addition, prior to the defendant's sentencing, the court held a disciplinary hearing on the attorney's conduct where, through the defendant's testimony, the attorney attempted to place the blame on his client in order to exonerate himself. *Id.* at 1026.

In contrast to these cases, the record here contains no suggestion of an adverse effect on Mora's representation. Unlike the defendant in *Moore*, Mora told the court Taylor did *not* attempt to suborn perjury. In fact, at the evidentiary hearing on Mora's habeas petition, Taylor's co-counsel, Cliff McIntyre, testified he and Taylor were not affected by the accusation but believed it was just a "self-serving way of *[sic]* the state to prosecute this defendant." (Appellant's App. Vol. II at 456-57.) Moreover, unlike the facts in *Greig*, the alleged conflict had no bearing on the testimony at trial. It did not prevent Taylor from calling Mora to testify on his own behalf and he fails to proffer any testimony that would have been elicited but for the State's allegation.

Instead, Mora argues his interests were adversely affected when counsel asked him whether he was telling the truth and whether anyone instructed him to lie. He contends counsel did so in spite of the possibility it might cause jurors to question his honesty. This argument is singularly unpersuasive. Attorneys often ask their clients whether they are telling the truth. Mora's trial lasted more than a week with a trial transcript spanning eight volumes, comprising over 1,400 pages. We cannot find Mora's interests were compromised by three routine questions which allowed Mora to tell the jury he was truthful. Accordingly, the New Mexico Supreme Court's ruling is neither contrary to clearly established federal law, nor is it an unreasonable application of the law to the facts of this case.

### (2)    Deliberate Interference

Based on the State's delay in notifying defense counsel of its subordination of perjury allegations, Mora claims the prosecution "deliberately interfered with [his] constitutional right to the effective assistance of counsel." (Appellant's Br. at 48.) Because we find no ineffective assistance stemming from the allegations against Mora's counsel or the resulting representation, we find no merit to this claim. Accordingly, Mora's various other contentions regarding this issue are also rejected.[5]

---

[5] Mora claims an actual conflict of interest obligated the trial court to conduct an inquiry and he should have been given the opportunity to consult with new counsel concerning the suborging perjury accusation. However, the trial court's "failure to make

### B. Failure to Recall Witness

Mora claims he was denied effective assistance of counsel because Taylor did not recall a State witness, Virginia Saavedra (Christina's grandmother), after discovering the State had mistakenly failed to disclose a taped interview with her. **[App't Br. at 38]** Review of Saavedra's interview revealed her account of the telephone conversation she had with Garcia the morning of Christina's injury. She stated Garcia told her Christina went to sleep "in the middle of watching the parade. And then [Garcia] went to get in the shower." (Appellant's App., Vol. I at 318.) Mora contends this testimony would have substantially supported his version of the facts and directly contradicted Garcia's testimony that Christina was fine and awake when she left the baby with Mora. He maintains "a reasonable probability exists that if the jury had received this potent impeachment evidence, the result of the trial would have been different." (Appellant's Br. at 39.) The state court disagreed and concluded the decision not to recall Saavedra, a hostile witness, was a reasonable tactical decision.[6]

At trial, after the testimony of Saavedra and Henry Campos (Garcia's step-

---

the *[Cuyler v.] Sullivan*-mandated inquiry does not reduce the petitioner's burden of proof. . . ." *Mickens,* 535 U.S. at 173-74. Because Mora failed to prove a conflict of interest that prejudiced his defense, this issue is rejected.

[6] The federal magistrate's report and recommendation took a different tack, concluding the statements were double hearsay and thus not allowable as impeachment evidence. Mora contests this interpretation of New Mexico's evidentiary rules. We need not reach the issue as we find the failure to recall Saavedra was a reasonable trial strategy.

father), the State discovered it failed to provide copies of two taped pre-trial interviews, one of Campos and the other of Saavedra. Mora's attorneys immediately moved for a mistrial due to the prejudice to Mora's ability to cross-examine the witnesses. The court withheld ruling and the tapes were provided to the defense for review over the weekend. The next day of trial, the court denied the motion for a mistrial but invited Mora's attorneys to recall Saavedra or any other witnesses for re-cross examination. Defense counsel declined.

At the state habeas evidentiary hearing, McIntyre, an inexperienced attorney at the time of the trial who assisted the more experienced Taylor, testified regarding defense counsels' strategy. He stated one reason they decided to forego recalling Saavedra was Taylor's belief the trial court committed reversible error when it denied a mistrial based on the State's failure to timely provide the tapes. He testified it was his impression that Taylor did not want to cross-examine Saavedra again because it could jeopardize the mistrial claim on appeal. McIntyre also stated he and Taylor determined Saavedra's position as a hostile witness and her possible rehabilitation by the government after their impeachment would outweigh any benefit from recalling her as a witness.

In determining whether counsels' strategy in this case was "objectively reasonable,"

> [W]e are bound to heed the Supreme Court's pointed warning in *Strickland v. Washington* . . . against using hindsight to second-guess

> attorneys' tactical decisions. *Strickland* requires us to impose a heavy presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, ... the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . Thus, under *Strickland,* we must uphold counsel's performance so long as the challenged action *might* be considered *sound* trial strategy. . . .

*United States v. Aptt*, 354 F.3d 1269, 1284 (10th Cir. 2004) (internal citations and quotations omitted).

Mora argues defense counsel based their strategy on a misunderstanding of the law—that the mistrial issue would be waived if Saavedra was called back to the stand. He asserts, "[w]hen the state court then reasoned that, according to *Strickland*, this 'tactic,' conceived from counsel's own imagination of what the law was rather than any foundation in reality, somehow fell within the range of what a competent lawyer does, the court's position became diametrically opposed to *Strickland*." (Appellant's Br. at 41.)

"The purpose of ineffectiveness review is not to grade counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). "To state the obvious: the trial lawyers, in every case, could have done something more or something different." *Id*. More than a simple mistake of law is needed. *See Bullock v. Carver*, 297 F.3d 1036, 1048 (10th Cir.) ("an attorney's unawareness of relevant law at the time he made the challenged decision does not, in and of itself, render the attorney's performance constitutionally deficient"),

-26-

*cert. denied*, 537 U.S. 1093 (2002); *Hawkins v. Hannigan*, 185 F.3d 1146, 1154-55 (10th Cir. 1999) (even assuming counsel was mistaken as to the scope of the stipulation, the decision to enter the stipulation was a reasonable trial decision).

Even if Taylor made a legal mistake in assessing the advantages and disadvantages of recalling Saavedra, the decision was based on sound reasons as well. Saavedra was a sympathetic witness, a grieving grandmother openly hostile to Mora, the man she believed killed her granddaughter. Although the taped interview may have affected Garcia's credibility, this advantage was tempered by the State's opportunity to allow Saavedra to explain the discrepancy and at the same time give her a second chance to tell her side of the story.

Mora contends the reasons for failing to recall Saavedra are not viable in light of the critical importance of the credibility issues. However, her statement had only limited potential for boosting Mora's credibility since it did not fully support even one of Mora's alternative versions of the facts. In his statement to the police, also admitted into evidence, Mora stated Christina was awake from the time he got up until Garcia went to take her shower. At trial, he testified he did not watch the parade and that Christina was asleep from the time he got up. Neither of these versions are fully supported by Saavedra's interview statements. Thus, the state court's determination that defense counsel made a tactical decision in this instance is not an unreasonable application of *Strickland*.

## C. Failure to Object to Improper Use of Prior Felony Conviction

At trial, and over defense counsel's objection, the court allowed the State to cross-examine Mora regarding his guilty plea to a felony charge of possession of a stolen weapon the summer before Christina's death. Defense counsel attempted to mitigate the State's characterization of the felony by allowing Mora to explain, on redirect, the circumstances surrounding his arrest for the charge. Mora testified he and Garcia were "making out" in the car and he was arrested when an officer found a weapon underneath the seat. On re-cross, the government established the type of weapon, an Uzi Tec-9, and that Mora knew the gun was stolen.

In closing argument, defense counsel argued the felony was only a minor run-in with the law and Mora was a hardworking boy. In response, the state argued Mora was not a mild-mannered young man—he was "found with [] a Tec-9 machine-gun." (2d Supp. App. Vol. VIII at 81.) The New Mexico Supreme Court held the prosecutor's closing remarks were not improper because "the State did not use this conviction as substantive evidence of [Mora's] guilt." *Mora*, 950 P.2d at 804. The state habeas court ruled counsel was not ineffective in failing to object because he had previously opened the door. Mora contends the state court erred in "[c]oncluding . . . that counsel was not ineffective when he failed to object to the impermissible closing argument *because* he had previously been

ineffective in opening the door." (Appellant's Br. at 44.) He argues this conclusion is an objectively unreasonable application of *Strickland*.

Once defense counsel's objections to admission of the conviction were overruled, it was reasonable to try to humanize the felony by eliciting testimony about the surrounding facts. In closing argument, defense counsel again attempted to characterize these negative facts in the light most favorable to Mora. Thus, opening the door was a reasonable trial strategy. The prosecutor's rebuttal was also a fair response to the spin given by defense counsel. Thus, the failure to object to the State's remarks was not ineffective assistance of counsel. The state courts reasonably applied *Strickland* in reaching the same conclusion.

## D. Confrontation Clause Objection

In Mora's pre-trial statement to the police he said he talked with his friend, Joseph Sena, for about ten minutes on the morning of November 24 while Garcia was showering. In an interview with police, Sena denied talking with Mora that day. Sena died before trial. As a result, the State gave pre-trial notice it intended to introduce Sena's statement under the catch-all exception to the hearsay rule, N.M. R. EVID. 11-804(B)(5). Mora's attorneys objected based on hearsay and prejudice, but raised no Confrontation Clause objection. The trial court overruled the objections and a police officer read the transcript of Sena's interview at trial. After the evidence had been admitted, defense counsel moved for a mistrial based,

in part, on a Confrontation Clause violation. Mora now claims the New Mexico Supreme Court erred on direct appeal when it ruled the statement was admissible. He also claims the state habeas court misapplied *Strickland* in ruling the failure to assert a Confrontation Clause objection prior to the jury hearing Sena's statement was not ineffective assistance of counsel.

We need not review the New Mexico Supreme Court's evidentiary ruling because, even if the trial court erred in admitting the evidence and professional norms required Mora's attorneys to raise a constitutional objection, Mora failed to establish he was prejudiced by counsel's omission. As the Supreme Court has stated, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Even when we regard the unaffected findings as a given and consider the effect of the assumed errors on the remaining findings, Mora has not established the jury's decision "would reasonably likely have been different absent the errors." *Id*. at 696. Sena's statement was not the only evidence calling Mora's veracity into question. Randy Chavez, Garcia's cousin, testified to Mora's statements while the family was in the hospital waiting room on November 24.

-30-

When the doctors told the family Christina had massive bleeding, the family asked if Christina's head injury could be due to a recent fall in the parking lot. When the doctor said no, Mora "stated voluntarily all of a sudden that Christina had fallen out of bed" recently and Mora had not told Garcia prior to that moment. (2d Supp. App., Vol. IV at 79-80, 87.) He stated Mora also gave "two different stories [regarding] what time and who was present when he put [Christina] to bed" that morning. (*Id*. at 88.) At one point Mora said Christina was fine when she fell asleep on the couch and that he put her to bed himself. At another time, Mora said Christina was falling asleep and he picked her up at about the time Garcia finished her shower so he and Garcia put Christina to bed together. As discussed above, Mora's own statements to police conflicted with his testimony at trial. Add to this the medical testimony regarding the nature and timing of Christina's injuries and there is little doubt the jury's conclusion would have been the same even had Sena's statement been held inadmissible based on his counsel's objection. *See Hawkins*, 185 F.3d at 1161 (no prejudice established given expert testimony, medical testimony and defendant's own conflicting statements). Again, the state courts did not unreasonably apply *Strickland* to this claim.[7]

_____

[7] In his reply brief, Mora raises a cumulative error issue. We do not ordinarily review issues raised for the first time in a reply brief. *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). Moreover, the absence of a finding of any error renders a cumulative

## CONCLUSION

In sum, the state courts correctly determined the evidence sufficient to sustain Mora's convictions and he received effective assistance of counsel at trial. The state courts' conclusions were not unreasonable applications of clearly established federal law and were based on reasonable determination of the facts. AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

error analysis inapplicable. *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990).