This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date:   June 2, 2016**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                                                    **NO.  S-1-SC-35112**

**JESUS JOAQUIN ARREDONDO-SOTO,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Charles W. Brown, District Judge**


Bennett J. Baur, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Laura E. Horton, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

{1} Jesus Joaquin Arredondo-Soto (Defendant) appeals his convictions for first-degree murder, contrary to NMSA 1978, Section 30-2-1(A)(2) (1994), and tampering with evidence, contrary to NMSA 1978, Section 30-22-5(A) (2003). Defendant challenges his convictions on four grounds, arguing that: 1) the trial court abused its discretion under Rule 11-403 NMRA by admitting a photograph of a child victim's bloody handprints over Defendant's objection; 2) the trial court committed fundamental or plain error by admitting autopsy photographs of a child victim's bloody hands and feet, and a photograph of that child victim's ripped shirt; 3) there was insufficient evidence to support Defendant's conviction of first-degree murder; and 4) there was insufficient evidence to support Defendant's conviction of tampering with evidence.

{2} We reject each of Defendant's claims of error and affirm his conviction for first-degree murder. We render this non-precedential decision because settled New Mexico law controls each of the issues raised by Defendant. *See* Rule 12-405(B)(1) NMRA.

**I.     BACKGROUND**

{3} On Sunday, August 22, 2010, Juan Jose Trejo-Mora received a phone call that

2

his home at 721 Rim Drive in Albuquerque was on fire. Trejo-Mora and his wife were in Santa Rosa at the time, where he had planned to spend the afternoon at the lake. After getting the phone call, Trejo-Mora called Defendant and asked him to go check on the home. The two were close—Defendant worked for Trejo-Mora, lived with Trejo-Mora for a few months after immigrating from Mexico, and Defendant's wife was Trejo-Mora's cousin. In fact, on August 21, 2010, Trejo-Mora invited Defendant to borrow his truck from Albuquerque and take Defendant's family and the Trejo-Mora's niece (Victim) and her infant son (Child Victim), both of whom were living with Trejo-Mora, to join them at the lake the following afternoon.

{4} When firefighters entered the Trejo-Mora home they came upon the deceased bodies of a woman and an infant. The firefighters noticed blood as they entered the home and it turned out the bodies had sustained major trauma. The bodies belonged to Victim and Child Victim. Victim sustained approximately twenty-six stab wounds and Child Victim's throat was slit. There was no smoke or soot underneath the bodies, indicating that they had not been moved after the fire started. Autopsy reports confirmed that the victims were deceased prior to the fire.

{5} As Trejo-Mora arrived at the scene he observed Defendant with a mark on his face and a bandaged hand, which Defendant explained was the result of a fight with

3

a junkie. After walking through his home, Trejo-Mora reported that nothing was missing except a laptop, knife, and his Chevrolet Cobalt—the knife and laptop were actually already collected by police, and the Chevrolet Cobalt was recovered at 352 63rd Street near Defendant's home at 217 63rd Street, his home being 1.25 miles away from the crime scene. There was blood on the driver's seat, front center console, and driver's side floor mat.

{6}     A doctor from the Office of the Medical Investigator testified that Victim received twenty-six stab wounds, but that it was hard to tell how many of the big injuries were actually more than one injury. For instance, a stabbing incise wound on the left side of Victim's neck was so large it transected the major carotid artery and the trachea, cutting the windpipe straight through. One of those wounds extended down to the bone, near where the tip of the knife that was used in the attack was found broken off inside Victim's neck. Child Victim also suffered wounds to the neck, those wounds transecting both jugular veins resulting in blood loss and a compromised airway due to blood leakage into the trachea. The nature of Child Victim's neck wounds indicated multiple knife thrusts, as they ranged from incisions to scrapes.

{7}     Police collected blood samples from inside and outside the home, as well as from inside the Cobalt. Investigators noted that there were passive blood drops and

4

transfer evidence (like bloody flip-flop footprints) in and around the home. There were bloodstains in the hallway on the floor and on the wall above the bodies, and droplets of blood on the pavement outside. There were also bloodstains in the bathroom sink, where a knife was found. The knife tested positive for blood.

{8}     Blood samples were tested against DNA of Victim, Child Victim, and Defendant. Fifteen blood samples were collected from inside and outside the home; of the fifteen, Victim could not be excluded as a donor to eight of the samples, Child Victim could not be excluded as a donor to three of the samples, Defendant could not be excluded as a donor to eight of the samples, and four samples contained some combination of Victim, Child Victim, and/or Defendant's DNA. There was no unknown DNA in any of the samples, and only one sample contained insufficient DNA for analysis.

{9}     Ten blood samples were collected from the Cobalt; of the ten, Victim could not be excluded as a donor to four of the samples, Child Victim could not be excluded as a donor to two of the samples, Defendant could not be excluded as a donor to eight of the samples, and four samples contained some combination of Victim, Child Victim, and/or Defendant's DNA. Of those, one sample had insufficient DNA to draw a conclusion with respect to a contribution from either Victim or Child Victim, and two

samples contained low level DNA from an individual that the analyst did not have a comparison standard for (those two samples came from the driver's step board and the driver's floor mat).

{10}  Three samples were taken from the knife; Victim could not be excluded as a donor to any of the three samples, Defendant could not be excluded as a donor to two of the samples, and Child Victim was excluded from all three of the samples. That is, Child Victim's DNA was not in any of the blood samples taken from the only weapon recovered by investigators.

{11}  As mentioned, when Trejo-Mora arrived at his home, he came in contact with Defendant. After the police left Defendant and Trejo-Mora entered the home, and Defendant "saw that there was, like, blood and small hands marked on the walls, and [he] left instead. [He] couldn't be there anymore. And then after that, the next day [he] left." Defendant went to Mexico four days after the crime, but he was arrested and extradited back to the United States.

{12}  Defendant was then interviewed on April 26, 2011, by a detective. According to Defendant, on the day of the incident—starting at about 6:00 p.m. or 7:00 p.m.—he had been drinking and doing cocaine, as well as three little unidentified blue pills, with his neighbors. Apparently the cocaine ran out, and his wife called him back

inside at about 9:00 p.m. or 10:00 p.m., but he ultimately woke up inside the Cobalt with blood on his clothes at 6:00 a.m. Scared of the bloody clothes, Defendant went home, bathed, and threw out his shirt and pants in the trash outside his apartment. The Cobalt's keys were in the pockets of his pants when he threw them away. Defendant was wearing flip flops.

{13}     Soon after the murders, a neighbor had asked Defendant if he did it and he responded "Yes, . . . it was me." Defendant also told his wife that "yes, I did it," and that he had gone to the Trejo-Mora home to steal. Upon hearing Child Victim's throat had been slit, Defendant said "I don't want to remember," "I was scared because I did wrong, that's why. But I don't remember it."

{14}     Defendant made less than $500 a week, but was spending $200 of that on drugs for two or three months leading up to the murders. Also, Defendant did not have any money on that night of the murder to buy drugs because his wife had bought groceries and he had already spent the balance on cocaine and alcohol. Defendant spoke of his drug use by saying "[n]o one made me. No one forced me to use. I did it myself."

{15}     At trial Defendant objected to admission of photographs from the crime scene depicting Victims' bodies as they were found by the firefighters. The trial court excused the jury to discuss the State's plans regarding photographic evidence. The

7

State provided that it would show three crime scene photos, State's Exhibits 19, 20, and 21:

> one that showed both the living room area and the hallway; one that then is just the hallway; and then one that is then more of a close-up of the blood on the wall that does depict at least the upper portion of the woman and probably two-thirds of the body of the infant.

Defendant requested that only one of the three be admitted, but the trial court ruled that, in addition to Exhibit 19, the State could introduce only one of the others. The State chose Exhibit 20, in the interest of comity, because Defendant had further objected to Exhibit 21 (close-up depicting bodies and blood). While at that time the trial court chose to only allow two photographs of the bodies at the crime scene, it ultimately allowed three because one more, Exhibit 15, was already admitted to depict what a firefighter witness described upon entering the home. Thus, three photographs were admitted showing the bodies at the crime scene, and one was excluded.

{16} The State also introduced an image of Child Victim's bloody handprints, State's Exhibit 74, to which Defendant objected. The trial court overruled the objection and admitted the photograph because it had "vertical and horizontal scales that would allow [the jury] to make certain determinations about these handprints that's not in the others."

{17} Also admitted were State's Exhibits 152, 153, and 156, which were autopsy

8

photos that depicted close-up images of Child Victim's bloody hands, lower legs, and feet. State's Exhibit 174 depicted Child Victim's bloody shirt—Elmo was the design—cut at the neckband. Defendant did not object to any of these four photographs.

{18} Defendant was convicted of two counts of first-degree murder for the killings of both Victim and Child Victim, one count of the unlawful taking of a motor vehicle, and two counts of tampering with evidence (for lighting fire to the home, and disposing of his clothing). The trial court judge vacated Defendant's conviction of felony murder for the killings of both Victim and Child Victim, with the predicate felony of intentional child abuse resulting in death, in accordance with principles of double jeopardy. Defendant was sentenced to two consecutive life terms plus three years.

{19} Defendant is only challenging his convictions for the killing of Victim. Defendant argues that the trial court violated Rule 11-403 by admitting State's Exhibit 74 (photograph of Child Victim's bloody handprints at the crime scene), 152 (autopsy photograph of Child Victim's hands), 153 (autopsy photograph of Child Victim's hands), 156 (autopsy photograph of Child Victim's legs and feet), and 174 (photograph of Child Victim's shirt). Defendant only objected to State's Exhibit 74

9

at trial. Defendant also challenges the sufficiency of the evidence supporting his conviction of first-degree murder for the killing of Victim and his conviction of tampering with evidence for disposing of his clothing to impede the police investigation. Defendant also argues that there was insufficient evidence to support the vacated conviction of felony murder of Victim based on the predicate felony of child abuse. The State concedes there was insufficient evidence to support that conviction. We conclude that there was no abuse of discretion or fundamental error by the trial court's admission of the five photographs and that there was sufficient evidence to support Defendant's convictions of first-degree murder and tampering with evidence.

## II.    DISCUSSION

### A.    Trial Court Did Not Abuse its Discretion by Admitting Photograph of Child Victim's Bloody Handprints (State's Exhibit 74)

{20}    Defendant first argues that the admission of the State's Exhibit 74 was unduly prejudicial and cumulative under Rule 11-403. Rule 11-403 states that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Defendant objected to the admission of this evidence at trial. When preserved below,

appellate courts review a trial court's decision to admit evidence for an abuse of discretion. *State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641; *see also State v. Martinez*, 1999-NMSC-018, ¶ 31, 127 N.M. 207, 979 P.2d 718 ("The trial court is vested with great discretion in applying Rule [11-403], and it will not be reversed absent an abuse of that discretion." (alteration in original) (internal quotation marks and citation omitted)). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted). If there are reasons both for and against a court's decision, there is no abuse of discretion. *Id.* It is a defendant's burden to establish that the trial court abused its discretion. *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20. Here, the trial court did not abuse its discretion by admitting State's Exhibit 74.

{21}     Defendant argues that State's Exhibit 74 should not have been admitted because similar images of children's bloody handprints are mainstays in horror films, which by their nature are meant to arouse the passions of viewers, meaning the photograph innately had an extremely prejudicial effect. And, since the photograph did not help prove any element of the charged crimes, its probative value was low. Defendant then

characterizes this photograph as having an "unusual propensity to unfairly prejudice, inflame, or mislead the jury," which under Utah's Rule 403 analysis requires "the proponent to show that the evidence has unusual probative value," or else it must be excluded. *See State v. Dunn*, 850 P.2d 1201, 1221-22 (Utah S. Ct.1993). Courts in Utah look at a variety of factors when assessing unusual prejudice, like if "the photographs are in color or black and white, when they were taken in relation to the crime, whether they are closeups or enlargements, their degree of gruesomeness, the cumulative nature of the evidence, and whether [the] facts shown are disputed by the defendant." *State v. Lafferty*, 749 P.2d 1239, 1257 (Utah S. Ct. 1988). As expected, Defendant urges this Court to adopt Utah's framework and rule in his favor that this photograph was unusually prejudicial and lacks the requisite unusual probative value.

{**22**}     In light of the Court of Appeals holding in *State v. Bahney*, the State counters that the photograph was admissible as photographic evidence of the crime scene as it was investigated. 2012-NMCA-039, ¶ 43, 274 P.3d 124 (concluding the trial court did not abuse its discretion by admitting six photographs of a victim's close-up charred body because they were a graphic depiction of the results of arson and murder, which were then relevant to the element in both charged crimes that the crimes had in fact happened, and passed Rule 11-403 muster because they showed the scene as it was

12

investigated). The State also argues that the photograph goes to an element of the crime because it establishes a timeline for the murder, which is an important component with respect to proving deliberate intent. And, the State further submits that the Utah standard is inapplicable here because the trial court has considerable discretion in determining the admissibility of evidence under Rule 11-403 in the context of the trial as a whole, correctly arguing that New Mexico's Rule 11-403 only requires that courts consider whether an item of evidence's prejudicial effect substantially outweighs its probative value. Given the trial court's consideration of the prejudicial effect of the one photograph of the bloody handprints, and its decision to only admit that one photograph and to limit photographs from the crime scene in general (there were many photographs relevant to the case, and only 175 admitted as exhibits), we conclude that the trial court did not abuse its discretion by admitting the photograph of Child Victim's handprints under Rule 11-403.

{23}     Regarding the photograph's probative value, the trial court expressly ruled that State's Exhibit 74 was admissible because it contained a scale that showed size and reference of the hands in order to clarify and illustrate testimony. The photograph of the handprints helped the State demonstrate that Child Victim was alive after Victim's blood had spilled onto the floor, that Child Victim had time to crawl in the blood and

make handprints on the wall, and that thus Defendant and Victim struggled for a prolonged time. The photograph, then, corroborates a detective's testimony that Victim was attacked before Child Victim, and that Child Victim was standing up after Victim had been bleeding. "[P]hotographs are "properly admitted within the discretion of the trial court if they are corroborative of other relevant evidence adduced at the trial, even though they may be cumulative." *State v. Ho'o*, 1982-NMCA-158, ¶ 19, 99 N.M. 140, 654 P.2d 1040 (referencing *State v. Upton*, 1955-NMSC-087, ¶ 11, 60 N.M. 205, 290 P.2d 440; *State v. Valenzuela*, 1976-NMSC-079, 90 N.M. 25, 559 P.2d 402).

{24} Regarding prejudice, a review of New Mexico case law considering the admission of gruesome photographs into evidence indicates a very high bar for an abuse of discretion under a Rule 11-403 challenge. *See, e.g.*, *State v. Saiz*, 2008-NMSC-048, ¶¶ 52-54, 144 N.M. 663, 191 P.3d 521 (holding that the trial court did not abuse its discretion by admitting five gruesome photographs of the victim's decomposed body, when those photographs aided the pathologist's testimony), *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783; *State v. Mora*, 1997-NMSC-060, ¶¶ 54-55, 124 N.M. 346, 950 P.2d 789 (upholding the admission of multiple autopsy photos of a child victim

on grounds that they were illustrative), *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683; *State v. Perea*, 2001-NMCA-002, ¶ 22, 130 N.M. 46, 16 P.3d 1105 (holding that a potentially inflammatory photograph of a victim's slashed face was relevant and that its admission was within the discretion of the trial court), *aff'd in part, vacated in part*, 2001-NMSC-026, ¶ 6, 130 N.M. 732, 31 P.3d 1006; *State v. Boeglin*, 1987-NMSC-002, ¶¶ 22-24,105 N.M. 247, 731 P.2d 943 (holding that the admission of a close-up photograph depicting gruesome neck wounds suffered by the victim was proper to "illustrate, clarify, and corroborate the testimony of witnesses"); *State v. Pettigrew*, 1993-NMCA-095, ¶¶ 9-11, 116 N.M. 135, 860 P.2d 777 (holding that photos of a battered victim were relevant to depict the extent of the victim's injuries and to illustrate a physician's testimony, and that their admission was not an abuse of discretion); *State v. Blakley*, 1977-NMCA-088, ¶ 27, 90 N.M. 744, 748, 568 P.2d 270 (holding that admission of a photograph of the victim's body was proper because it "illustrated, clarified, and corroborated the testimony of various witnesses").

{25}    Despite Defendant's analogy to the use of bloody handprints in horror movies, the image of bloody handprints in the instant context shows the scene as it was investigated and corroborates a detective's testimony that helped prove an element of

15

first-degree murder by establishing the murder's timeline, and thereby deliberate intent. *See Bahney*, 2012-NMCA-039, ¶ 45. Further, the trial court made a reasoned determination on the record with respect to the photograph's admissibility, choosing to exclude other photographs of the handprints. Thus, we conclude the trial court did not abuse its discretion by admitting State's Exhibit 74 because its prejudicial effect does not substantially outweigh its probative value.

**B.      Trial Court Did Not Make Fundamental or Plain Error by Admitting Three Autopsy Photographs of Child Victim and Photograph of Child Victim's Shirt (State's Exhibits 152, 153, 156, and 174)**

{26}      Defendant next takes issue with the admission of State's Exhibits 152, 153, 156, and 174, which are autopsy photographs of Child Victim's hands and feet and a photograph of Child Victim's shirt, but failed to preserve his objection to these photographs at trial. Because Defendant failed to preserve this issue, this Court only reviews the trial court's admission of these exhibits for plain or fundamental error. *See* Rule 11-103 (E) NMRA; Rule 12-216 (B) NMRA. In either case, admission of the evidence must cause an injustice that creates grave doubts concerning the validity of the verdict. *See State v. Barraza*, 1990-NMCA-026, ¶ 17, 110 N.M. 45, 791 P.2d 799, *cert. denied*, 109 N.M. 704, 789 P.2d 1271 (1990). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so

16

doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco*, 1992-NMSC-006, ¶ 12, 113 N.M. 780, 833 P.2d 1146. "The doctrine of fundamental error is to be resorted to in criminal cases only for the protection of those whose innocence appears indisputably, or open to such question that it would shock the conscience to permit the conviction to stand." *State v. Rodriguez*, 1970-NMSC-073, ¶ 10, 81 N.M. 503, 469 P.2d 148.

{27}     Review on the basis of plain error is less stringent than with fundamental error and only applies to evidentiary matters. *State v. Lucero*, 1993-NMSC-064, ¶ 13, 116 N.M. 450, 863 P.2d 1071.

> Unlike the situation in the case of fundamental error, to find plain error we need not determine that there has been a miscarriage of justice or a conviction in which the defendant's guilt is so doubtful that it would shock the conscience of the court to allow it to stand.

*Id.* Instead, "the error complained of must have affected substantial rights although [the plain errors] were not brought to the attention of the judge." *Id.* (alteration in original) (internal quotation marks and citation omitted). Here there was neither fundamental nor plain error by admission of the four photographs.

{28}     Defendant emphasizes the fact that there was still blood on the limbs of the lifeless Child Victim in the autopsy photographs (152, 153, 156), and that thus these close-up autopsy photographs have little probative value but greatly increase the

17

danger of inflaming the jury, "conveying little information beyond the fact that the victims died violent and bloody deaths." *Lafferty*, 749 P.2d at 1257. With respect to the image of Child Victim's shirt (174), Defendant argues that the cut in the collar and blood covering Elmo's smiling images imbues the image with an unusual propensity for unfair prejudice, again by reference to Utah's case law.

{29} The State responds by arguing that the relevant exhibits do not emphasize the horror of an infant's death, but instead lay out evidence of the fact that an infant did in fact lose his life. "It is not the State's responsibility to sanitize Defendant's crime," the State argues, and further, these photos merely depict the facts as they are in reality. The State also emphasizes the fact that the trial court carefully considered the wide body of evidence the State sought to admit, and limited the evidence by not admitting everything. Under the strict standard of review this Court must apply, since Defendant failed to object to these four photographs at trial, we conclude there was neither plain nor fundamental error.

{30} Again, by reference to New Mexico's case law with respect to the admission of gruesome and inflammatory photographs under Rule 11-403 (as described in subsection A of this Opinion), the prejudicial effect of these photographs did not unfairly outweigh their probative value. These autopsy photographs corroborate a

18

detective's testimony as to the murder's timeline similar to the admission of the photograph of the bloody handprints. By these photographs the jury can infer that Child Victim's limbs were in fact covered in blood, corroborating the length of time he spent in blood as Victim was killed—leading, again, to deliberate intent. As well, the autopsy photographs depict the nature and extent of Child Victim's injuries. The photograph of Child Victim's shirt corroborates testimony by the OMI analyst that multiple knife thrusts were needed to slit Child Victim's throat. Further, the presence of Elmo on the shirt does not increase its prejudicial impact; if Elmo was not there, Defendant may have instead referenced the small size of the shirt as being unusually prejudicial and, as the State argues, it is not the State's obligation to sanitize the crime for Defendant. It is the trial court's responsibility only to exclude unduly prejudicial evidence that threatens the trial's fairness by substantially outweighing its probative value. Here, there was not undue prejudice by these four photographs—they corroborated the testimony of witnesses and depicted the real effects of the crime. As such, the photographs' admission did not constitute plain or fundamental error.

**C.    There Was Sufficient Evidence Supporting Defendant's Conviction of First-degree Murder for the Killing of Victim**

{31}    Defendant challenges the sufficiency of the evidence regarding his deliberate intent to kill Victim. "Evidence is sufficient to sustain a conviction when there exists

19

substantial evidence of a direct or circumstantial nature to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Smith*, 2016-NMSC-007, ¶ 19, 367 P.3d 420 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532. (internal quotation marks and citation omitted). "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted).

{32}     "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). "Deliberate intention" is intention "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." *State v. Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176 (quoting UJI 14-201 NMRA). "Though deliberate intent requires a calculated judgment to kill, the weighing required for deliberate intent may be arrived at in a short period of time." *State v. Guerra*,

20

2012-NMSC-027, ¶ 28, 284 P.3d 1076 (internal quotation marks and citation omitted).

{33} "Deliberate intent may be inferred from the particular circumstances of killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515. Deliberate intent to kill can be established when a killing takes several minutes and a defendant had motive to kill a victim. *State v. Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829. Substantial evidence of deliberation can include fleeing the scene, disposing of evidence, or concocting false alibis. *Flores*, 2010-NMSC-002, ¶ 22. It can also include overkill, like shooting postmortem or inflicting a large number of stab wounds, killing a victim over a prolonged period of time, or pursuing a victim that evades capture. *Smith*, 2016-NMSC-007, ¶¶ 20-23 (collecting cases, and finding deliberate intent where the defendant stabbed his former girlfriend ninety times); *Guerra*, 2012-NMSC-027, ¶ 29 (concluding that a defendant who rendered the victim defenseless and then proceeded to stab the victim thirteen times was overkill sufficient to establish deliberate intent, particularly where many of the wounds were to vital organs); *Flores*, 2010-NMSC-002, ¶ 22 (determining that a factor supporting deliberate intent was proof the defendant stabbed the victim "so many times that it evidenced an effort at overkill").

{34} Defendant argues that apart from the high number of stab wounds none of the

21

other hallmarks of deliberate intent—motive, carefully crafted plan, statements of a defendant—were present. Thus, Defendant argues, the controlling authority should be the Court's opinion in *State v. Garcia*, where it concluded that the evidence was insufficient to support a rational jury's finding of deliberation. *See* 1992-NMSC-048, ¶ 28, 114 N.M. 269, 837 P.2d 862. Defendant asserts that this was a crime of passion, much like the crime committed in *Garcia*. However, *Garcia* was factually dissimilar. The defendant in *Garcia* stabbed a victim during a fight. *Id.* ¶ 7. While that fight was the second between the combatants that afternoon, and while the defendant could conceivably have formed a deliberate intent to kill in between the two fights, there was no evidence that such deliberate intent had actually been formed. *See id.* ¶ 30. Unlike *Garcia*, though, there is sufficient evidence in this case of Defendant's deliberate intent to kill Victim.

{35}     Here, Defendant stabbed Victim at least twenty-six times, severing her carotid artery and breaking off the tip of the murder weapon in her neck. *Cf. Smith*, 2016-NMSC-007, ¶ 22. There is also evidence of a prolonged struggle given Victim's defensive wounds and the location of her injuries on both the front and back of her body, as well as the amount of blood on Child Victim's body and the handprints he left on the wall. *Cf. id.* The State argues the position of Victim's body in relation to

22

Child Victim, who was two feet away, is further evidence of a prolonged struggle. In fact, a detective testified that the struggle was intense and featured physical interaction between Defendant and Victim. Defendant also had a motive to be in the home that night—Defendant having stated he was at there to steal—and the jury could have reasonably inferred that once inside the home he deliberated and formed a motive to kill Victim to ensure that Trejo-Mora did not know he had stolen from his home.

**{36}** Further, Defendant apparently attempted to destroy the evidence by lighting Trejo-Mora's home on fire. And, Defendant not only fled the crime scene, but the jurisdiction as well. Such evidence of flight or attempt at deceiving law enforcement can demonstrate consciousness of guilt that supports a conviction of deliberate intent. *Cf. Flores*, 2010-NMSC-002, ¶¶ 22-23.

**{37}** In light of the extent of Victim's injuries, the evidence of a prolonged struggle, and Defendant's consciousness of guilt as demonstrated by flight and his attempts to destroy evidence, we conclude there was sufficient evidence to support a rational jury's conviction of first-degree murder.

**D.** **There Was Sufficient Evidence Supporting Defendant's Conviction of Tampering with Evidence for Disposing of His Clothing**

**{38}** Defendant next argues that there was insufficient evidence that he threw away his bloodstained clothing in order to impede a police investigation. Instead, Defendant

claims the only evidence offered at trial was that Defendant threw away his clothing because it was stained and unusable, and not because he sought to avoid detection by law enforcement. There was sufficient evidence to support a rational jury's inference of intent by Defendant to avoid apprehension by law enforcement through the act of disposing of the bloodstained clothing.

{39} Under New Mexico law, tampering with evidence is "destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5(A). When direct evidence of an intent to disrupt an investigation is lacking, it is often inferred from an overt act of the defendant. *Duran*, 2006-NMSC-035, ¶ 14. For example, in a case involving death by gunshot to the head, evidence that the defendant gave a gun to his brother shortly after the killing, instructed his brother to hold it, and then lied to the police about his knowledge of the gun's whereabouts was sufficient evidence of an overt act from which the jury could infer his intent to tamper with evidence. *State v. Arellano*, 1977-NMCA-126, ¶ 9, 91 N.M. 195, 572 P.2d 223. However, absent both direct evidence of a defendant's specific intent to tamper or evidence of an overt act from which the jury may infer such intent, the evidence cannot support a tampering

24

conviction. *Duran*, 2006-NMSC-035, ¶ 15.

**{40}** Here there was sufficient evidence of an overt act from which the jury could have inferred Defendant's specific intent to tamper with evidence. As the State argues, there were photos from the crime scene, extensive DNA blood analysis, and Defendant's statements that he woke up in the Cobalt with blood on his clothing—all pieces of evidence that suggest that this was a bloody murder. As well, Defendant's conduct in lying about how he got his injuries and in fleeing the jurisdiction supports the jury's inference that Defendant was keen to avoid a police investigation by disposing of his clothing, and was not just worried that a washing machine would be incapable of rendering the clothing wearable at a future date. As such, we conclude that the evidence was sufficient for a rational jury to infer that Defendant's conduct in disposing of the clothing in a trash bin outside his home was an overt act to hide evidence, supporting Defendant's conviction of tampering with evidence.

**III.    CONCLUSION**

**{41}** There was sufficient evidence to support Defendant's convictions of first-degree murder of Victim and tampering with evidence for disposing of his bloodstained clothing. As well, the trial court neither abused its discretion nor committed plain or fundamental error by admitting challenged photographs under

Rule 11-403. We affirm Defendant's convictions.

{42}     **IT IS SO ORDERED.**


_____
**BARBARA J. VIGIL, Justice**

**WE CONCUR:**


_____
**CHARLES W. DANIELS, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**JUDITH K. NAKAMURA, Justice**